ANNE D. ALLEN, AS EXECUTRIX OF THE ESTATE OF HARLEY ALLEN, DECEASED, AND ANNE D. ALLEN, INDIVIDUALLY, PLAINTIFF-APPELLANT, v. METROPOLITAN LIFE INSURANCE COMPANY, A CORPORATION, DEFENDANT-RESPONDENT.

Argued January 18 and 19, 1965—Decided March 29, 1965.

*Mr. Joseph J. MacDonald* argued the cause for appellant (*Messrs. Hein, Smith & Mooney,* attorneys).

*Mr. Eugene M. Haring* argued the cause for respondent (*Messrs. McCarter & English,* attorneys).

*Messrs. Stryker, Tams & Dill* filed a brief for The Prudential Insurance Company of America, *Amicus Curiae* (*Mr. William L. Dill, Jr., Mr. John J. Monigan, Jr.,* and *Mr. William Taylor Sutphin,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The Appellate Division reversed the judgment entered in the Law Division in favor of the plaintiff Anne D. Allen and directed that judgment be entered in favor of the defendant Metropolitan Life Insurance Company. 83 *N. J. Super.* 223 (1964). We granted certification on the plaintiff's application. 43 *N. J.* 133 (1964).

On April 4, 1960 Richard Tambouri, an agent of the defendant insurance company, and Frank Cafaro, the assistant manager of the company's Westwood office, called at the home of Harley Allen for the purpose of selling him a life insurance policy. Also present were Allen's wife Anne and her brother Joseph. After some discussion Allen agreed to purchase a $12,000 policy, naming his wife as beneficiary. Tambouri filled in Allen's answers to the questions in Part A of the application for the policy and Allen signed it. The application set forth that the company would incur no liability "except as may be provided in a Conditional Receipt given on and bearing the same date as this application."

Upon his signing of the application Allen gave Tambouri a check in the sum of $576.42 for the first annual premium. The check was payable to the Metropolitan Life Insurance Company and was deposited by the company in regular course.

Tambouri delivered a conditional receipt which provided in pertinent part as follows:

"*If the amount received on this date is equal to the full first premium on the policy applied for* and (1) the application as originally submitted is approved at the Company's Home Office for the policy applied for, either before or after the death of the Life Proposed, then in such circumstances the policy applied for will be issued effective as of this date or (2) if the Life Proposed dies within 30 days from this date as a result of accidental bodily injury caused by external violence, then, provided that a death benefit does not become payable under a policy issued pursuant to (1) above or under a policy other than the one originally applied for, the Company will pay the amount of life insurance applied for (not including any additional accidental means death benefit) subject to the following conditions: (a) the aggregate amount payable under this provision and similar provisions of all conditional receipts issued by the Company in connection with applications on the Life Proposed shall not exceed $25,000, (b) payment will be made in one sum to whoever would have been entitled to payment if a policy had been issued, (c) no such payment will be made if death occurs as the result of suicide."

On April 28, 1960 Allen was stricken with a coronary occlusion and died almost immediately. On the same day Tambouri became aware of Allen's death. On May 5, 1960 Dr. Entmacher, the company's associate medical director, was informed of Allen's death. Later that day he declined to approve the application and thereafter the company denied all liability to the plaintiff except for return of the $576.42 premium which was tendered but refused. In due course, the plaintiff instituted her action against the company in the Law Division seeking recovery of the face amount of the policy.

In the Law Division, the plaintiff testified that when the application was being discussed on April 4th, Messrs. Tambouri and Cafaro told her husband that there would be immediate coverage if the premium were paid in advance and no other reason was given by them for the making of such advance payment. She also testified that when the conditional receipt was given to her husband, Mr. Tambouri said, "here is your binder." Her testimony was corroborated by that of

her brother. Messrs. Cafaro and Tambouri testified that Allen was told there would be immediate coverage "if there was nothing organically wrong." In a pretrial deposition, Mr. Cafaro had testified that he recalled a conversation after Allen had signed the application in which Mr. Tambouri had said to Allen that he would get coverage commencing now if he paid his premium in advance. Interoffice correspondence after Allen's death indicated that the manager of the company's Westwood office customarily described the conditional receipt as a "binding receipt."

Judge Marini, sitting in the Law Division, viewed the conditional receipt as an ambiguous instrument and received the oral testimony as to the discussions which preceded its signing for such aid it might serve in resolving the ambiguity. He explicitly found that the Allens had been told that there was immediate coverage,[1] and he inquired rhetorically: if there were no immediate coverage, why would the company take the advance premium and of what benefit "could a thing of this sort be to a person who applies for insurance." He rejected the company's contention that its responsibility under the conditional receipt should turn on the insurability of the applicant, pointing out that the receipt said nothing about the assured being in good health "or that he is organically sound"; and he concluded that Allen was covered by "interim insurance" without regard to any ultimate finding on the issue of insurability.

When Allen made his application for insurance he told Messrs. Tambouri and Cafaro that he had been hospitalized some weeks earlier and when he appeared before Dr. Spranz on April 8th for his physical examination he answered fairly all of the questions which appeared in Part B of the application. These answers included reference to the fact that on March 11, 1960 he had complained of severe pain localized to the pit of his stomach, was admitted to Pascack Valley

---

[1] This factual finding is amply supported by the evidence in the record and we accept it on appeal. See *State v. Johnson*, 42 *N. J.* 146, 161 (1964).

Hospital in Westwood, had two electrocardiograms and gallbladder and gastrointestinal X-rays, and was discharged after 7 days without symptoms and with the positive finding of a sluggish gallbladder. The results of Dr. Spranz's own medical examination of Allen, set forth in Part C of the application, were negative except for a finding that he was overweight.

The application containing Parts A, B and C was sent to the company's home office in New York where it was received on April 12th and was thereafter processed through several underwriters. On April 28th, the company's medical correspondence division sent a request to the Pascack Valley Hospital for a report and the report was received at the company's home office on May 2nd. On May 5th the application, along with the hospital report, was received by Dr. Entmacher and on the same day he rejected it. The report, as sent to the defendant, contained a diagnosis of acute cholecystitis and anginal syndrome whereas the hospital's original records referred to acute cholecystitis and "anginoid" syndrome. Dr. Entmacher testified that acute cholecystitis is inflammation of the gallbladder, that anginal syndrome relates to pain arising from an inadequate supply of oxygen to the heart muscle, and that the term anginoid is properly defined as resembling angina.

Dr. Entmacher referred in his testimony to the defendant's Medical Impairment Guide which contains a list of medical impairments and the appropriate action to be taken. The Guide contained an entry relating to gallbladder disease which provided that if the disease had occurred less than one year previously and no operation had been performed there was an extra rating of $3.50 per thousand dollars of insurance. It contained no entry for anginal or anginoid syndrome but did contain an entry for anginal pectoris. Dr. Entmacher testified that this entry would apply to anginal syndrome, that the medical rating for anginal pectoris is the same as for coronary thrombosis or occlusion with normal electrocardiogram, and that if impairment had occurred less than three years previously the medical rating is from "decline to 450"; he also

testified that when the Guide expressly covers the application at hand it directs the medical underwriter's action but when it does not it is up to the underwriter to use his own judgment. See 83 *N. J. Super.*, at *pp.* 238–239.

Dr. Entmacher stated that he considered Allen to be uninsurable because it had been the company's practice "not to take a person with anginal syndrome or coronary occlusion within six months." He acknowledged that before he acted on Allen's application, Dr. Spranz had notified him of Allen's death and had stated, though mistakenly, that "the Company was not getting a fair deal because death claims were not being submitted on currently held insurance policies in the hope that the present application will be issued." Dr. Entmacher testified that this information from Dr. Spranz did not influence him at all and that his denial of Allen's application was entirely independent from it.

In dealing with the issue of insurability, Judge Marini noted that Dr. Spranz's own examination contained nothing which would indicate uninsurability, that the defendant's Guide contained nothing which necessitated a finding of uninsurability in the circumstances at hand, and that Dr. Entmacher's finding of uninsurability was a matter of judgment made and declared after he had been informed of Allen's death and had been inaccurately informed that there had been an unfair effort by the plaintiff to defer death claims on other policies of the decedent. Judge Marini questioned whether Dr. Entmacher could exercise a fair and independent judgment on the issue of insurability after the communication from Dr. Spranz and he concluded as follows:

"Now, assuming that I am wrong in saying that insurability is of no moment in this case and if it should be found by some other Tribunal that insurability is a defense, that is the status of being either insurable or not insurable, I find as a fact that the defendant did not show that this decedent was uninsurable as far as their actual Impairment Guide is concerned and that it would depend upon somebody's opinion afterwards, and I find that that opinion was influenced and motivated by the fact that the man had already died."

On appeal from the judgment entered by Judge Marini in the plaintiff's favor, the Appellate Division found that the conditional receipt was not ambiguous, that the evidence as to the conversations between the defendant's representatives and Allen was not admissible, that although there was no reference to insurability in the conditional receipt such reference is to be implied, that the decedent was uninsurable under the established practices of the defendant company, and that the company did not delay unreasonably in acting on the application. On the basis of these findings, the Appellate Division reversed the lower court's judgment (83 *N. J. Super.* 223). In support of the Appellate Division's action, the defendant urges that its determination of uninsurability was made in good faith and without any regard to the death of the applicant, and that under the circumstances there should be no recovery. It rejects the suggestion that insurability should in any event be determined on the basis of industrywide standards rather than its own company practices, asserting that no such industrywide standards exist.

Binders and binding receipts affording coverage pending policy issuance are well known in the insurance industry. See 12 *Appleman, Insurance Law and Practice* §§ 7221–7233 (1943); 1 *Couch on Insurance 2d* §§ 14:26–14:46 (1959). In the fire insurance field they have presented little difficulty and have readily been dealt with by the courts as affording full interim protection pending the company's issuance or rejection of the policy. See *Robertson v. Burstein,* 104 *N. J. L.* 218, 220 (*Sup. Ct.* 1928), rev'd on other grounds 105 *N. J. L.* 375 (*E. & A.* 1929); 29 *Am. Jur., Insurance* § 205, at *p.* 596 (1960). In the life insurance field they have presented considerable difficulty and have been dealt with by the courts throughout the country in varying fashions. Compare *Life Ins. Co. of No. America v. DeChiaro,* 68 *N. J. Super.* 93 (*Ch. Div.* 1961), *Ransom v. The Penn Mutual Life Insurance Company,* 43 *Cal. 2d* 420, 274 *P. 2d* 633 (1954), and *Gaunt v. John Hancock Mut. Life Ins. Co.,* 160 *F. 2d* 599 (2 *Cir.*), *cert.* denied 331 *U. S.* 849, 67 *S. Ct.* 1736, 91 *L. Ed.* 1858

(1947), with *Simpson v. Prudential Insurance Co. of America*, 227 *Md.* 393, 177 *A.* 2d 417 (1962), *Adolf v. Union National Life Insurance Company*, 170 *Neb.* 38, 101 *N. W.* 2d 504 (1960), and *Smiley v. Prudential Ins. Co. of America*, 321 *Mich.* 60, 32 *N. W.* 2d 48 (1948). See 63 *Yale L. J.* 523 (1954); 44 *Yale L. J.* 1223 (1935); 2 *A. L. R.* 2d 943 (1948).

Much of the difficulty may be laid at the doorstep of the life insurance industry itself for, despite repeated cautions from the courts, it has persisted in using language which is obscure to the layman and in tolerating agency practices which are calculated to lead the layman to believe that he has coverage beyond that which may be called for by a literal reading. The reports are replete with instances where company agents, as here, obtained payment of the full annual premium in advance on the broad representation that there would be interim coverage pending the company's investigation of the application and its action thereon. See, *e. g., Wood v. Metropolitan Life Insurance Company*, 193 *F. Supp.* 371, 372 (*N. D. Cal.* 1961), aff'd *per curiam* 302 *F.* 2d 802 (9 *Cir.* 1962); *cf. Cheek v. Pilot Life Ins. Co.*, 215 *N. C.* 36, 1 *S. E.* 2d 115, 116–117 (1939); *Simpson v. Prudential Insurance Co. of America, supra*, 177 *A.* 2d, at p. 419; 44 *Yale L. J., supra*, at p. 1231; 63 *Yale L. J., supra*, at p. 533; 60 *Harv. L. Rev.* 1164, 1165 (1947). Indeed, the very acceptance of the premium in advance tends naturally towards the understanding of immediate coverage though it be temporary and terminable; any collateral advantage other than interim coverage is insubstantial and is not what the lay applicant is generally seeking by his advance payment. See *Simpson v. Prudential Insurance Co. of America, supra:*

"Coverage from a date earlier than that of the issuance or acceptance of the policy was undoubtedly thought advantageous by the applicant. The apparently slight value to him of any other benefits accruing from an earlier effective date may be of assistance in arriving at the intention of the parties. Early coverage was probably the only advantage of early payment which the applicant even thought of. *Cf. Gaunt v. John Hancock Mutual Life Ins. Co., supra*, 160 *F.* 2d 599

(*O. O. A.* 2), *cert.* denied, 331 *U. S.* 849, 67 *S. Ot.* 1736, 91 *L. Ed.* 1858." 177 *A.* 2d, at *pp.* 423–424

In *Gaunt, supra,* a solicitor of the insurance company obtained a signed application which provided that if the first premium has been paid and, if the company is satisfied that on the date of the completion of Part B of the application the applicant was insurable and, if the application is prior to death "approved by the Company at its Home Office," then the insurance shall be in force as of the date of the completion of Part B. The first premium was paid in advance to the solicitor and was duly forwarded to the company. Learning of the applicant's death, the company did not approve the application and the named beneficiary sued to recover the face amount of the policy. In allowing recovery, Judge Learned Hand declined to read the requirement of approval literally, pointing out that the application was to be submitted to persons who were unacquainted with the niceties of life insurance and who would read it colloquially. He then had this to say:

"It is the understanding of such persons that counts; and not one in a hundred would suppose that he would be covered, not 'as of the date of completion of Part B,' as the defendant promised, but only as of the date of approval. Had that been what the defendant meant, certainly it was easy to say so; and had it in addition meant to make the policy retroactive for some purposes, certainly it was easy to say that too. To demand that persons wholly unfamiliar with insurance shall spell all this out in the very teeth of the language used, is unpardonable. It does indeed some violence to the words not to make actual 'approval' always a condition, and to substitute a prospective approval, however inevitable, when the insured has died before approval. But it does greater violence to make the insurance 'in force' only from the date of 'approval'; for the ordinary applicant who has paid his first premium and has successfully passed his physical examination, would not by the remotest chance understand the clause as leaving him uncovered until the insurer at its leisure approved the risk; he would assume that he was getting immediate coverage for his money." 160 *F.* 2d, at *pp.* 601–602.

■■ Though it expressed the view that the conditional receipt here was unambiguous, the Appellate Division itself proceeded to construe it away from its literal terms. See 83

*N. J. Super.,* at *p.* 232. When read literally, the receipt gave no interim protection at all in the absence of an approval by the company at its home office either before or after death. That clearly was not Allen's understanding and indeed the Metropolitan itself does not now urge such understanding. Its position is that if Allen was actually insurable at the time of the application, he had full interim coverage, otherwise not, and that its own later determination of uninsurability, though made after knowledge of Allen's death, is binding so long as it was made in good faith. That involves an interpretation of the receipt which does not appear in its terms. If, as the defendant seemingly suggests, the relatively recent insertion in its conditional receipt form of the phrase "either before or after the death of the Life Proposed" had that in mind, its purpose was indeed well hidden. Nowhere within the four corners of the receipt is there any reference to insurability or to the manner in which insurability is to be ascertained. It may well be doubted whether an applicant would ever understandingly agree to accept, as binding, a nonobjective determination of insurability first made by the company after knowledge of his death. In any event and in the particular light of all of the foregoing, we accept Judge Marini's ruling that the conditional receipt here would not be unambiguous to the average layman for whom it was intended; that being so, his admission of the oral testimony as an interpretative aid was entirely proper and violated neither the parol evidence rule nor any pertinent provisions of the application. See *Wadsworth v. New York Life Insurance Company,* 349 *Mich.* 240, 84 *N. W. 2d* 513 (1957), where the court, after quoting from Judge Hand's opinion in *Gaunt, supra,* said:

"We believe the instant provisions were similarly ambiguous and that competent oral testimony should have been admitted as to the circumstances surrounding the taking of the application and the expressed understanding of the parties on the question of the effective date of this policy. Where equivocal words are used in a contract, parol evidence is admissible to aid in arriving at the intention of the parties. *Borden v. Fletcher's Estate,* 131 *Mich.* 220, 91 *N. W.* 145;

*Brown v. A. F. Bartlett & Co.*, 201 *Mich.* 268, 167 *N. W.* 847; *Weber v. Cole*, 323 *Mich.* 485, 35 *N. W. 2d* 396; 9 *Wigmore, Evidence* (3d ed.), §§ 2465, 2472." 84 *N. W. 2d*, at *p.* 519

See also *VanKoevering v. Manufacturers Life Insurance Company*, 234 *F. Supp.* 786, 788–789 (*W. D. Mich.* 1964); 2 *Couch, supra*, § 15:57; *cf. Garden State Plaza Corp. v. S. S. Kresge Co.*, 78 *N. J. Super.* 485, 495–502 (*App. Div.*), certif. denied, 40 *N. J.* 226 (1963); *cf. also Mattia v. Northern Ins. Co. of New York*, 35 *N. J. Super.* 503 (*App. Div.* 1955); *Mayfield v. Montana Life Ins. Co.*, 62 *Mont.* 535, 205 *P.* 669 (1922); *Bleam v. Sterling Insurance Company*, 360 *Mich.* 208, 103 *N. W. 2d* 466 (1960).

█ While insurance policies and binders are contractual in nature, they are not ordinary contracts but are "contracts of adhesion" between parties not equally situated. See *Steven v. Fidelity and Casualty Co. of New York*, 58 *Cal. 2d* 862, 27 *Cal. Rptr.* 172, 377 *P. 2d* 284, 296–298 (1962); *cf. Linden Motor Freight Co., Inc. v. Travelers Ins. Co.*, 40 *N. J.* 511, 524–525 (1963); *Henningsen v. Bloomfield Motors, Inc.*, 32 *N. J.* 358, 389 (1960). The company is expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the assured or prospective assured is a layman unversed in insurance provisions and practices. He justifiably places heavy reliance on the knowledge and good faith of the company and its representatives and they, in turn, are under correspondingly heavy responsibility to him. His reasonable expectations in the transaction may not justly be frustrated and courts have properly molded their governing interpretative principles with that uppermost in mind. Thus we have consistently construed policy terms strictly against the insurer and where several interpretations were permissible, we have chosen the one most favorable to the assured. See *Mazzilli v. Accident & Cas. Ins. Co. of Winterthur*, 35 *N. J.* 1, 7–8 (1961). In *Kievit v. Loyal Protect. Life Ins. Co.*, 34 *N. J.* 475 (1961), we left little doubt as to our current approach by using this pertinent language:

"When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.' Francis, J., in *Danek v. Hommer*, 28 *N. J. Super.* 68, 76 (*App. Div.* 1953), affirmed 15 *N. J.* 573 (1954). See *Schneider v. New Amsterdam Cas. Co.*, 22 *N. J. Super.* 238, 242 (*App. Div.* 1952) ; *Mahon v. American Cas. Co. of Reading, supra*, 65 *N. J. Super.*, at *p.* 165 ; *cf. Dittmar v. Continental Cas. Co.*, 29 *N. J.* 532, 542 (1959) ; *Yannuzzi v. U. S. Casualty Co.*, 19 *N. J.* 201, 207 (1955). See also *Matits v. Nationwide Mutual Ins. Co.*, 33 *N. J.* 488, 495 (1960) ; *Indemnity Ins. Co., etc. v. Metropolitan Cas. Ins. Co. of New York*, 33 *N. J.* 507, 512 (1960). Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective." 34 *N. J.*, at *pp.* 482–483

When the company's representatives solicited Allen they could readily have taken his application without any advance premium. For reasons important to the company and to its financial advantage, they sought and obtained the annual premium in advance on the assertion that their receipt would afford immediate coverage. There can hardly be any question as to Allen's reasonable expectations in the circumstances. Acting in entire good faith he told the company's representatives of his earlier stay at the hospital and later had his physical examination, the results of which were largely negative. He then awaited action on his application which was delayed for several weeks. Although he knew that his application might ultimately be rejected, he undoubtedly assumed there was interim coverage in the event he died, for that was the very reason he had paid the $576.42 in advance. Indeed, if he was not so covered what justification could the company fairly advance for having taken that large sum from him; surely not the insubstantial collateral advantages which it now asserts or the protection against accidental death which he could have purchased separately for a relatively insignificant amount. See *Gaunt v. John Hancock Mut. Life Ins. Co., supra*, 160 *F. 2d*, at *p.* 601; Woodrough, J., dissenting in

*New England Mutual Life Ins. Co. of Boston v. Hinkle,* 248 *F. 2d* 879, 887–889 *(8 Cir.* 1957), cert. granted, 356 *U. S.* 901, 78 *S. Ct.* 560, 2 *L. Ed. 2d* 579, writ dismissed as improvidently granted, 358 *U. S.* 65, 79 *S'. Ct.* 116, 3 *L. Ed. 2d* 106 (1958).

It appears to us that when confronted with conditional receipts in the form used by the defendant or, in comparable form, recognition of interim coverage pending the company's approval or disapproval would be the just and equitable course and would fulfill the applicant's reasonable expectations while avoiding the serious impracticalities which would result from acceptance of the company's position that liability should turn on its good faith determination of insurability; these impracticalities are particularly evident where, as here, the company's Impairment Guide is not dispositive, no industrywide standards of insurability appear, and the company places its reliance on a judgment determination of uninsurability first made by its own medical director after he had knowledge of the applicant's death. See *Ransom v. The Penn Mutual Life Insurance Company, supra,* 43 *Cal. 2d* 420, 274 *P. 2d* 633; *Metropolitan Life Insurance Company v. Grant,* 268 *F. 2d* 307 *(9 Cir.* 1959); *Wood v. Metropolitan Life Insurance Company, supra,* 193 *F. Supp.* 371, 302 *F. 2d* 802; *Duncan v. John Hancock Mut. Life Ins. Co.,* 137 *Ohio St.* 441, 31 *N. E. 2d* 88 (1940); *Hart v. Travelers' Ins. Co.,* 236 *App. Div.* 309, 258 *N. Y. S.* 711 (1932), aff'd *per curiam,* 261 *N. Y.* 563, 185 *N. E.* 739 (1933); cf. *American National Insurance Company v. Thompson,* 44 *Tenn. App.* 627, 316 *S. W. 2d* 52, 57 (1957), cert. denied by Tenn. Sup. Ct. (1958); *Liberty National Life Insurance Co. v. Hamilton,* 237 *F. 2d* 235, 237–241 *(6 Cir.* 1956). See also *Life Ins. Co. of No. America v. DeChiaro, supra,* 68 *N. J. Super.* 93; cf. *Reck v. Prudential Ins. Co.,* 116 *N. J. L.* 444, 446–447 *(E. & A.* 1936); but cf. *Hemhauser v. Metropolitan Life Ins. Co.,* 106 *N. J. Eq.* 15 *(Ch.* 1930).

In *Ransom v. The Penn Mutual Life Insurance Company, supra,* the applicant was solicited for insurance by the defend-

ant's agent who accepted payment of the first premium and issued a receipt which stated that the insurance shall be in force when the application is signed, provided that the company shall be satisfied that the prospective insured was at that date "acceptable under the Company's rules for insurance upon the plan, at the rate of premium and for the amount applied for." The application referred to a previous medical examination by Dr. Long and when the company received Dr. Long's report it requested that the applicant submit to a further medical examination. Before that could be arranged he was killed in an automobile accident. After receiving notice of the death, the company rejected the application and the beneficiary sued to recover the face amount of the policy. A jury's verdict for the beneficiary was sustained in an opinion which in effect held that there was interim coverage without regard to whether or not the applicant was insurable under the company's rules and practices. In the course of his opinion for the California Supreme Court, Chief Justice Gibson noted that the understanding of the ordinary person was controlling and that "such a person upon reading the application would believe that he would secure the benefit of immediate coverage by paying the premium in advance of delivery of the policy." He referred to the obvious advantage to the company in obtaining payment of the premium when the application is made and voiced the thought that "it would be unconscionable to permit the company, after using language to induce payment of the premium at that time, to escape the obligation which an ordinary applicant would reasonably believe had been undertaken by the insurer." 274 P. 2d, at p. 636; see 7 Stan. L. Rev. 292 (1955).

In *Metropolitan Life Insurance Company v. Grant, supra,* the court applied *Ransom* to a case in which the applicant had paid his premium in advance under an application provision that if it "is approved at the Company's Home Office for the class, plan, and amount of insurance herein applied for, then the insurance in accordance with the terms of the policy applied for shall be in force from the date hereof." A medical

examination was to be made but the applicant died accidentally before the date scheduled for the examination. The company rejected the application and refused payment contending that under the language here, which differed from that in *Ransom*, there was no interim coverage. This contention was rejected by the Court of Appeals for the Ninth Circuit which pointed out that *Ransom* did not turn on language niceties but on the view that where the company has taken the premium in advance while using language calculated to induce such payment, it should not be permitted to escape the obligation which the ordinary applicant would reasonably believe had been undertaken by the insurer. As expressed in the opinion of Circuit Judge Orr:

"The set up in the application reasonably presents a picture to an applicant that two stages are present. First pay the portion of the premium required in advance and in consideration thereof you will have protection until your application is accepted or rejected. Second, if appellant accepts the risk a policy will be issued in due course." 268 *F*. 2*d*, at *p*. 310

In *Wood v. Metropolitan Life Insurance Company, supra*, the applicant was visited by an agent of the Metropolitan. The applicant told the agent that another company had declined to accept him as a risk but nonetheless the agent accepted his premium in advance and advised that there would be immediate coverage under the application provision that if the first premium is paid and accepted at the time of the signing of the application "and if this application is approved at the Company's Home Office for the class, plan, and amount of insurance herein applied for, then the insurance in accordance with the terms of the policy applied for shall be in force from the date hereof." A receipt delivered by the agent at the time of the payment of the premium contained similar language. The applicant underwent a medical examination and shortly after its completion he died of a heart attack. Thereafter, and with knowledge of the intervening death, the company rejected the application. Its doctor testified that without

knowledge of the death he had concluded that the applicant was not an insurable risk. The District Court held that under *Ransom* and *Grant* there was interim coverage and that the company was liable for the face amount of the policy; it pointed out that even after *Ransom* and *Grant* had been decided, the company took no steps towards altering its language and its practices to avoid interim coverage and from this it may be inferred that the company would rather assume the calculated risk than "lose the benefits flowing from the general acceptance of premiums in advance." 193 *F. Supp.*, at *p.* 374. On appeal, the District Court's holding was affirmed in an opinion which pointed out that "under the California rule as reflected in *Ransom* the insurability of the applicant at the time of application is irrelevant." 302 *F. 2d,* at *p.* 803.

Though *Ransom, Grant* and *Wood* arose in one of our sister states, they evidence an approach which we consider to be highly persuasive and not incompatible with prior judicial decisions in our own State. See *Reck v. Prudential Ins. Co., supra,* 116 *N. J. L.* 444, and *Life Ins. Co. of No. America v. DeChiaro, supra,* 68 *N. J. Super.* 93. In *Reck,* the applicant applied for a policy and paid the first monthly premium. The receipt given to him stated that the insurance shall take effect from the date of the application "provided said application is approved and accepted at the Home Office of the Company in Newark, New Jersey, under the plan, for the premium paid and amount of insurance applied for, and provided the person proposed was in sound health on the date of the application." The company agreed to return the premium if it declined the policy. The applicant died within two days of the delivery of the receipt and the company later rejected the application but apparently neglected to return the premium. In sustaining a jury verdict in favor of the beneficiary, the court stated that it was not impressed with the company's contention that there must have been actual formal approval at its home office, suggesting that this could be inferred from its retention of the premium. Justice Lloyd pointed out that,

by the terms of the receipt, the insurance became effective on the date of the application and the payment of the premium unless the premium be returned and that "if the insurance was then effective the death of the insured at a later date could not impair the rights of the insured or those holding under him." 116 *N. J. L.*, at *p.* 447. In *Ransom*, the court included *Reck* within a group of cases which it cited as supporting the view that approval and acceptability provisions in receipts such as here create conditions subsequent rather than conditions precedent (274 *P. 2d*, at *p.* 635); and in *DeChiaro*, the Chancery Division stated that *Reck* had undermined *Hemhauser v. Metropolitan Life Ins. Co., supra,* 106 *N. J. Eq.* 15, as any authority for the notion that "the receipt was not effective as a contract of insurance except upon approval of the application." 68 *N. J. Super.*, at *p.* 106.

In *DeChiaro*, the insurance company's soliciting agent and the assistant manager of its Newark office called upon Frank DeChiaro to sell him insurance. On June 2nd, DeChiaro underwent a medical examination and two days later he filled in his application and paid the premium. At that time he was given a receipt which provided that the insurance shall take effect from the date of the application if the company at its home office shall be satisfied that the applicant was insurable at standard rates under its rules and practices "and shall approve without modification insurance for the amount and on the plan, applied for." On June 8th, DeChiaro was hospitalized and he died on June 16th. Later the company rejected the application and tendered return of the premium. The company instituted an action to cancel its receipt, asserting that DeChiaro could not qualify for the standard policy he had applied for and that it was under no liability. In rejecting the company's position, Judge Mintz approved the approach taken in *Ransom* (43 *Cal. 2d* 420, 274 *P. 2d* 633) and held that the receipt constituted interim coverage which entitled the beneficiary to recovery in the face amount of the policy. Fairly adapting our own approach in *Kievit* (34 *N. J.*, at *pp.* 482–483), he stated that the receipt holder was

"entitled to the broad measure of protection necessary to fulfill their reasonable expectation"; that while the receipt might be unambiguous to an underwriter, it was not so to the average layman who could conclude therefrom that "if he paid the advance premium, he would enjoy protection until his application is either accepted or rejected"; and that it would be unconscionable to permit the company, after using language to induce payment of the premium, "to escape the obligation which an ordinary applicant would reasonably believe had been undertaken by the insurer." 68 *N. J. Super.*, at *p.* 107.

Within the principles expressed in *Ransom* and *DeChiaro*, which we now fully approve, the plaintiff here was clearly entitled to the judgment entered in her favor in the Law Division. The action of the Appellate Division setting aside that judgment and directing judgment for the defendant is:

Reversed.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For affirmance*—None.