Thomas, Appellant, *v.* The Chesapeake Life Insurance Company.

Argued March 28, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Leonard B. Rosenthal,* with him *Albert Momjian* and *Abrahams & Loewenstein,* for appellant.

*Edward Blumstein,* with him *Anthony T. Vanore,* and *Elkman, Blumstein and Block,* for appellee.

OPINION BY SPAETH, J., December 11, 1973:

This is an action in assumpsit. Appellant (plaintiff below) claims that because of her husband's death she is entitled to life insurance benefits. It was agreed that the trial judge should decide the case without a jury

and on the pleadings, depositions, and briefs. The judge found for appellee (the life insurance company), and the court en banc dismissed exceptions to his finding.

On February 22, 1968, appellant's husband applied for a life insurance policy with appellee. A "binding receipt" was issued upon payment of $11.20, an amount equal to the policy premium. The conditions stated on the back of the receipt included: "Any insurance applied for . . . shall take effect on the date of the application or date of corresponding medical examination, whichever is later, provided that (a) the full first premium at the Company's published rates for the policy applied for has been paid at the time of making application therefor and declaration of such payment is made therein, (b) the Proposed Insured is on said effective date a risk acceptable to the Company under its rules, limits and standards, on the plan, for the amount, and at the rate of premium declared paid, and (c) no erasures or alterations have been made on the front or back of this printed form . . . ."

On May 14, 1968, appellee declared appellant's husband an unacceptable risk for the class and at the rate at which he had applied. This was based on information supplied by a doctor who had examined appellant's husband, as required by the policy, and had found him overweight for his height. However, appellant's husband was eligible for insurance in a special premium class at an increased rate, and appellee forwarded to its agent a policy and an amendment to the original application which appellant's husband was to sign and return. These materials were left at appellant's home shortly before her husband's death;* he never saw them,

---

* According to the lower court, "[c]onflicting testimony was presented regarding the date on which [appellee's] agent Harlan delivered the amended application and policy under the special premium class to plaintiff." Yet appellant states in her brief that

nor signed them, nor was the higher premium paid during his lifetime.

Appellant does not deny that there was a violation of the condition expressed in the binder: "[O]n the date of the application for the policy or date of corresponding medical examination, whichever is later," appellant's husband was overweight and was therefore not "a risk acceptable . . . on the plan, for the amount, and at the rate of premium declared paid." She argues, however, that this condition was a condition subsequent, not precedent, to the existence of an effective insurance contract; that therefore her husband was covered by a contract of temporary insurance that arose on the date he took the medical examination; and that this temporary coverage was to continue until a policy was issued or the risk was rejected and notice of the rejection given to the insured. Since, appellant contends, there was no notice of rejection prior to her husband's death, appellee is bound under a contract of temporary insurance. In support of this contention, appellant relies on *Stonsz v. Equitable Life Assur. Soc.*, 324 Pa. 97, 187 A. 403 (1936), and *Steelnack v. Knights Life Ins. Co. of America*, 423 Pa. 205, 223 A. 2d 734 (1966).

*Stonsz v. Equitable Life Assur. Soc., supra,* is not in point. There a miner applied for a policy containing provisions for death benefits, annuity payments for disability, and double indemnity. The binder recited that if he were found to be an insurable risk, the policy would be effective as of the date of application. Because the applicant was a miner, the carrier refused to give him double indemnity coverage, but it did issue a policy at an increased premium rate for death and disability benefits. In the period between application and

"[t]he agent received the policy by regular mail and delivered it to appellant on May 17, 1968," and that her husband died on May 18, 1968. We shall assume that appellant has correctly stated the facts.

issuance, the applicant suffered severe hand injuries and the issue was whether he could recover for these. The court discussed cases from numerous jurisdictions holding conditions written in binders either subsequent or precedent, but it did not have to decide whether in Pennsylvania the binder given the applicant created temporary coverage, for "the suit was not upon the receipt but upon the policy that was issued." *Id.* at 104, 187 A. at 406. The court found the policy ambiguous as to its effective date, and therefore held the carrier liable on the theory that the ambiguity had to be resolved in favor of the applicant.

*Steelnack v. Knights Life Ins. Co., supra,* is in point but does not support appellant's argument. There an applicant switched his application for one form of insurance to another form. The carrier asked him to submit to a medical examination, but before a date could be arranged, he was killed in an auto accident. The binder for both policies was similar to that involved here. It read in part as follows: "First: If a full first premium . . . has been paid at the time of making such application and declaration of such payment is made therein, the insurance, subject to the terms and conditions of the policy contract applied for and in use by the Company at this date *shall take effect on the date hereof provided*: . . . (3) the applicant is on this date a risk acceptable to the Company under its rules, limits and standards, on the plan and for the amount applied for and at the rate of premium declared paid; and (4) the applicant is on this date in good health; otherwise, the payment evidenced hereby shall be returned upon demand and surrender of this receipt." (Emphasis supplied.) *Id.* at 207, 223 A. 2d at 735. The binder made no reference to a medical examination. The court concluded:

"Nothing in the above language indicates that the insurance coverage was to be delayed until the medical examination took place and the insured was found to be in good health. In fact, the opposite is implicit therein, namely, that the coverage began on the date of the binder subject to being terminated if the medical examination revealed the insured not in good health.

"At best, the requested medical examination could only be a condition subsequent, which could terminate the insurance coverage in the event the company found the insured's health to be such that it could refuse to take him even as an accident risk. All this, of course, is hypothetical and could in no way adversely affect the insured's rights which began immediately with the receipt of the company's binders.

"If the insurance company had wished to make the taking of a medical examination a condition precedent to the contract, it should have done so with explicit language. It did not do so." *Id.* at 207-08, 223 A. 2d at 735.

It will be observed that in *Steelnack* the carrier was attempting to write into the binder a condition that was not there. The court said that at best the carrier was attempting to impose a condition subsequent. The court did not say that, where a binder expressly makes coverage effective upon the occurrence of certain conditions, the conditions will be deemed conditions subsequent, and not precedent, to the existence of a valid contract of insurance. The acceptable risk and good health conditions were treated by the court as conditions precedent. Since the carrier did not claim that these conditions were not satisfied, under the terms of the binder the applicant had coverage as of the date of the application. Thus at most *Steelnack* suggests that if an applicant who dies prior to the issuance of a policy or rejection of his application was in fact insurable on the effective date of the policy as set forth in the binder, the carrier is bound, and if the applicant was

not insurable, it is not bound.* The applicant does get temporary insurance but it turns upon his insurability. *See Morgan v. State Farm Life Ins. Co.,* 240 Ore. 113, 400 P. 2d 223 (1965) ; *Simpson v. Prudential Ins. Co.,* 227 Md. 393, 177 A. 2d 417 (1962).

There are numerous cases that read similarly worded conditions in binders as subsequent and find temporary coverage regardless of insurability. *See, e.g., Wood v. Metropolitan Life Ins. Co.,* 302 F. 2d 802 (9th Cir. 1962) (applying *Ransom v. Penn Mutual Life Ins. Co.,* 43 Cal. 2d 420, 274 P. 2d 633 (1954) ) ; *Metropolitan Life Ins. Co. v. Grant,* 268 F. 2d 307 (9th Cir. 1959) ; *Iwai v. Hawaiian Life Ins. Co.,* 51 Haw. 288, 459 P. 2d 195 (1969) ; *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 208 A. 2d 638 (1965) ; *Prudential Ins. Co. v. Lamme,* 83 Nev. 146, 425 P. 2d 346 (1967). Some of the holdings turn on ambiguities in the language of the binders. It is a universal rule of construction that ambiguities are to be resolved against the insurer. *Mutual Life Ins. Co. v. Hurni Packing Co.,* 263 U.S. 162 (1923). In the present case, however, there are no ambiguities in the binder, and we cannot read any into it.

It has been said that "where the company has taken the premium in advance while using language calculated to induce such payment, it should not be permitted to escape the obligation which the ordinary applicant would reasonably believe had been undertaken by the insurer." *Allen v. Metropolitan Life Ins. Co., supra* at 309, 208 A. 2d at 646. "Indeed, the very acceptance of the premium in advance tends naturally towards the understanding of immediate coverage though it be tem-

---

* We do not mean to suggest that there is a rule of law that can be applied to all binders. As the court noted in *Stonsz v. Equitable Life Assur. Soc., supra,* at 100, 187 A. at 405: "these receipts are not capable of general treatment, but must be individually interpreted to give them the effect which the parties intended them to have in each case."

porary and terminable; any collateral advantage other than interim coverage is insubstantial and is not what the lay applicant is generally seeking by his advance payment." *Id.* at 302, 208 A. 2d at 642. Such general statements, however, are not persuasive here.

As indicated above, where a binder is phrased like the one in *Steelnack v. Knights Life Ins. Co., supra* (and here), an applicant gets coverage from some time prior to notice of the acceptance of his application and the issuance of a permanent policy; his advance premium will provide him with temporary coverage provided he is insurable. Although we are interested in honoring the reasonable expectation of applicants, we regard it as highly likely that the typical insured believes that a binder provides him with temporary coverage only if he is an insurable risk. *Stonsz v. Equitable Life Assur. Soc., supra* at 101, 187 A. at 405. This conclusion, it may be added, conforms with the understanding of the parties in this case so far as that understanding can be determined from the record. From February, when the policy was applied for, until May, when the application was rejected, appellee did not demand, nor did appellant's husband pay, any monies as premiums; and appellant herself testified that her husband "didn't know when the policy was coming or whether he would be able to get it."

Keeton in his *Basic Text on Insurance Law* (1971) advances two considerations against construing binders in favor of temporary coverage regardless of insurability. First, because receipts typically provide for repayment of the premium if the application is rejected, the rejected applicant gets temporary coverage at "less per unit of insurance coverage than that paid by the applicant whose policy is accepted, since the consideration is merely a commitment of the premium subject to an obligation of the insurer to refund it if the application is rejected. Of course, the 'insurable' applicants make

up for the relative underpayment, since the premiums will be set at a figure high enough to pay the claims under the temporary insurance coverage as well as those under permanent policies." *Id.* at 44. Second, ". . . the only premiums collected and retained would be those from the insurables and the small percentage of uninsurables who died during the temporary period. The uninsurables who lived through that period would receive their premiums back . . . would have received temporary protection without contributing any premiums to the fund. This bargain for the border-line applicant who may prove to be uninsurable upon examination and investigation would provide a special inducement to borderline applicants to pay premiums in advance—a much stronger inducement than that operating upon the mind of the clearly insurable applicant. Thus, adverse selection would occur, that is, a disproportionately high percentage of advance premium payments would come from the border-line risks. Moreover, the premium rates paid by those contributing to the fund as well as receiving such temporary coverage would be at the same level as for an equivalent period . . . commencing at the date of the application. Thus, the losses paid would tend to be higher in proportion to the premiums collected for the temporary coverage than for permanent coverage, because of the lack of any adjustment of the premiums to take account of adverse selection." *Id.* at 45.

Accordingly, we hold that appellant's husband was not covered under a temporary contract of insurance comparable in terms to that for which he applied because one of the conditions set forth in the binder as precedent to the existence of an effective insurance contract was not satisfied.

Nor can we find that the policy issued by appellee was in effect. The application signed by appellant's husband provided that "no change shall be made in this application as to amount, classification, plan of insur-

ance, or benefits unless agreed to in writing by the applicant." Under this provision, the applicant must assent to a policy carrying a higher premium before there can be a contract. The same would be true even if there were no such provision. *Dunford v. United of Omaha*, 95 Idaho 282, 506 P. 2d 1355 (1973), presented facts similar to those involved here: an applicant was denied the policy he applied for but was sent another instead. Said the court: "When an insurance policy is issued materially differing from the policy applied for, such policy is a counter-offer which under the general rule of contracts amounts to a rejection of the application. Here the policy issued was different from the policy applied for and was thus a rejection of the original application. [The applicant], had he lived, could not have been forced to accept a policy with higher premiums than set forth on his application. The company's ratification form showed its realization that the issued policy was really a counter-offer." *Id.* at 285, 506 P. 2d at 1358. *See also New England Mut. Life Ins. Co. v. Hinkle*, 248 F. 2d 879 (8th Cir. 1957), *cert. dismissed*, 358 U.S. 65 (1958). *Cf. Stonsz v. Equitable Life Assur. Soc., supra* at 107, 187 A. at 408 (assuming issuance of policy without double indemnity coverage constituted counter-offer, applicant accepted by receiving policy and cashing premium refund check without protest). There is no evidence that appellant's husband, the applicant, accepted the carrier's counter-offer because he died.

The order of the court below is affirmed.