**Heather ZARAGOZA, Appellant,**

v.

**WEST BEND MUTUAL INSURANCE COMPANY, Appellee.**

No. 94–2075.

Supreme Court of Iowa.

May 22, 1996.

Gerald J. Kucera of the Tom Riley Law Firm, P.C., Cedar Rapids, for appellant.

Craig A. Levien and Vicki L. Seeck of Betty, Neuman & McMahon, L.L.P., Davenport, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, SNELL, and TERNUS, JJ.

HARRIS, Justice.

The trial court determined there was no coverage under a liability insurance policy sold to plaintiff's judgment debtor. The judgment creditor appeals, claiming coverage under a theory that the vehicle was either furnished only for casual, not regular, use, or was a "newly acquired vehicle" under provisions in the policy, and also on theories of reasonable expectations and bad faith. We affirm.

On May 27, 1989, a pickup truck driven by Lori Johnson was involved in a single-vehicle collision. Plaintiff Heather Zaragoza, a passenger, sustained serious injuries. Both occupants were high school students. Lori lived with her parents Richard and Bobbi Johnson who had purchased an insurance policy from defendant West Bend Insurance Co.

Lori's grandfather, Charles Kessler, thought he owned the pickup, or that it was held in the name of one of his corporations. After the accident it became known that Charles' son, Richard Kessler, was the titleholder. The title mix-up apparently occurred when Charles traded another pickup to Richard for the one involved in the accident. The pickup involved in the accident had been provided to Lori—and her family—in mid-April. The plan was for Lori to drive the pickup to "see if she liked it." If she did, Kessler stated he would give the vehicle to her and, on May 12, 1989, Kessler said he intended to do so. But the title was not transferred.

Two prior suits serve as background for the present one. After the accident West Bend brought a declaratory judgment action against the Johnsons seeking a declaration of no coverage under Richard and Bobbi's policy. The Johnsons counterclaimed, alleging West Bend's bad faith. A consent order was entered providing the vehicle was not covered under the Johnsons' policy, and that West Bend had no duty under the policy to defend them in any action arising out of the accident. The bad-faith claim was dismissed with prejudice. West Bend agreed to pay the Johnsons' attorney fees. Heather was not made a party to that action.[1]

After resolution of the declaratory judgment action, Heather brought a suit alleging Lori was negligent. Lori then filed for bankruptcy. Heather then moved in the bankruptcy action for relief from the automatic stay so she could pursue her claim against Lori. The motion was granted in part; Heather was allowed to proceed by attempting to collect on any claim Lori might have against West Bend. Heather then recovered a default judgment against Lori in the amount of $750,000 after which Heather brought the present suit against West Bend in an attempt to collect on the judgment. *See* Iowa Code § 516.1 (1995) (judgment creditor has right of action against an insurer if execution of judgment is unsatisfied).

The case went to trial before a jury during which Richard Johnson testified he had not asked West Bend about insuring the pick-up truck prior to the accident. He said this was because he did not have title to the vehicle. He did testify he had asked his insurance agents on several occasions whether his daughters would be covered under his insurance policy no matter what car they were driving and was told they would be. Based on this representation, Johnson claimed he believed the truck was covered under his policy at the time of the accident.

Johnson purchased the policy through Patrick and Neil Doyle, who were independent insurance agents. Patrick Doyle testified Johnson had asked him whether his daughters were covered under the policy if they were driving other people's cars, and he responded that the owner's insurance would be primary, "but if [the owner] did not have insurance, the Johnsons' insurance would probably take care of it." In contrast, Neil Doyle testified he could not conclusively recall whether Johnson made such an inquiry directly to him. But if he had, Neil testified he would have responded that coverage would be provided "as long as [the daughters] had the permission of the owner of the

---

1. No one suggests Heather, even though not a party to the declaratory judgment action, might be precluded by its disposition because she stands in Lori's shoes. We thus give no consideration to such an issue.

vehicle and as long as it wasn't ... furnished for their use."

At the close of Heather's case, West Bend moved for a directed verdict, arguing the pickup truck was not a covered vehicle under the Johnsons' policy because it was neither a listed vehicle nor a newly acquired one. The court found the pickup truck was not newly acquired, and even if it were, the Johnsons had failed to request coverage within thirty days and pay an additional premium. It also found the truck was not an owned vehicle and that the vehicle was furnished or available for regular use. The court determined Heather had not presented sufficient evidence on claims, later discussed, of coverage under the doctrine of reasonable expectations or bad faith. Accordingly the court granted West Bend's motion for a directed verdict. The matter is before us on Heather's appeal from that ruling.

█ I. In considering the propriety of a motion for a directed verdict, we view the evidence in the light most favorable to the party against whom the motion was made. Iowa R.App.P. 14(f)(2). Thus West Bend is considered to have admitted the truth of all evidence offered by Heather and every favorable inference that may be deduced from it. *B & B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 284 (Iowa 1976). If reasonable minds could differ, an issue is for the jury. *Meeker v. City of Clinton*, 259 N.W.2d 822, 828 (Iowa 1977).

II. We first consider Heather's claim that she presented a jury question of coverage under the policy, either because Lori was driving a vehicle that was not "furnished or available for regular use," or because it was "newly acquired."

█ A. *Regular use.* A provision in the policy provided coverage for liability resulting through the use of:

> 2. Vehicles that you or your family do not own, provided the vehicle is not owned by or furnished or available for regular use by you or a family member. Your liability to the owner for damage to a borrowed or rented vehicle is included.

Heather contends the pickup was not furnished for Lori's regular use because it had been provided for her to try out only in order to learn whether she liked it.

Although the term is common in automobile liability policies, "regular use" has no hard and fast legal definition. One interpretation explains:

> Whether an automobile is furnished by another to an insured for his regular use may reasonably depend upon the time, place and purpose for which it is to be used. One furnished for all purposes and at all times and places would clearly be for his regular use. One furnished at all times but strictly for business purposes alone could hardly be said to have been furnished for his regular use at a time and place when it was being used for personal purposes.

*American Hardware Mut. Ins. Co. v. National Farmers Union Property & Cas. Co.*, 422 N.W.2d 402, 404 (N.D.1988) (adopting the language found in *Pacific Auto. Ins. Co. v. Lewis*, 56 Cal.App.2d 597, 132 P.2d 846, 848 (1943)). In this regard we have found the following sign posts to be of assistance:

> 1. Was the use of the car in question made available most of the time to the insured?
>
> 2. Did the insured make more than mere occasional use of the car?
>
> 3. Did the insured need to obtain permission to use the car or had it been granted by blanket authority?

*General Cas. Co. of Wis. v. Hines*, 261 Iowa 738, 747, 156 N.W.2d 118, 124 (1968); *Bringle v. Economy Fire & Cas. Co.*, 169 N.W.2d 879, 882 (Iowa 1969).

The facts on this issue are not in dispute. Beginning in mid-April the vehicle was available *all of the time* to the Johnson family. It was used *on a daily basis* by various family members, with Lori driving it sixty to seventy percent of the time. No permission was needed from the vehicle's purported owner, Charles Kessler, but rather *blanket authority* had been granted to "try it out."

Heather contends the fact that the Johnsons were trying the vehicle out to see if they liked it saves her claim. Several cases have held that when a person is test driving a

vehicle or driving a "loaner" while awaiting repairs, coverage may not be excluded under a "furnished for regular use" clause. *See, e.g., Truck Ins. Exch. v. Wilshire Ins. Co.,* 8 Cal.App.3d 553, 87 Cal.Rptr. 604, 609–10 (5th Dist.1970) (test driving); *George B. Wallace Co. v. State Farm Mut. Auto. Ins. Co.,* 220 Or. 520, 349 P.2d 789, 792 (1960) (loaner). But the test drives or temporary uses involved in those cases were much more casual than the Johnson family's use for several weeks of the pickup here.

It is to be remembered that regular-use provisions in liability policies are designed to provide coverage to the insured while engaged in only the infrequent or merely casual use of vehicles other than those listed in the policy, and to do so without requiring an additional premium. But the extension of this coverage is limited. Coverage is not provided with respect to use of any vehicle which the insured frequently uses or has the frequent opportunity to use. The limitation is necessary because, without it, there would be an increased risk without a corresponding increase in the premium. *See Bringle,* 169 N.W.2d at 882; *American Hardware Mut. Ins. Co.,* 422 N.W.2d at 405.

Lori's use of the pickup far exceeded that associated with a casual test drive of a vehicle before deciding to purchase it from a commercial auto dealer, or even from an arm's-length private seller. By all accounts the pickup was provided to Lori to use as her regular vehicle for several weeks. The nature of her use was not altered by the fact that the vehicle would be given to her for the asking. The trial court was correct in determining that no jury question was generated on the issue.

■ B. *Newly acquired vehicle.* We also agree that the pickup did not qualify as "newly acquired" so as to be covered under the policy. The pertinent part of the policy explains:

2. Heather is presented with something of a dilemma in selecting a day she claimed to have acquired the vehicle. It would not serve her to claim it was in mid–April when Lori came in possession because that was more than thirty days prior to the accident and the "newly acquired" coverage extends only thirty days. She would resolve the dilemma by lowering the sta-

PART B.   Motor Vehicle Liability.

We will cover you and your family for any liability that results through the use of any motor vehicles owned or leased that are listed on the Declarations Page.   In addition, we will cover:

1.   Newly acquired vehicles of the same types if you ask us to within 30 days and pay the additional premium.   If the new vehicle replaces one already covered, it will automatically be covered.

The policy does not define the term "acquired," but the term clearly calls for something more than appears here.

Although Heather concedes the Johnsons never obtained a certificate of title to the pickup, she argues ownership was "acquired" on May 12, 1989, when Kessler stated his intention to give it to Lori.[2]  West Bend, on the other hand, contends the Johnsons never acquired an ownership interest in the vehicle because title was never transferred.   It therefore concludes the newly acquired provision does not apply.

Two provisions in Iowa Code chapter 321 are implicated: section 321.45(2) (right, title or interest in a vehicle can be claimed or recognized only by virtue of certificate of title issued in accordance with the chapter); and section 321.493 (vehicle owner liable for damages when caused by a vehicle driven with consent, but sale and transfer—rather than change of certificate of title—ends liability).   West Bend contends section 321.45(2) controls; Heather contends section 321.493 controls.

In *State Farm Mutual Automobile Insurance Co. v. Wyant* we explained the relationship of the two statutes this way:

Section 321.493 ... applies between an alleged car owner and a third person when the third person asserts a damage claim against such owner.   *E.g., State Auto & Cas. Underwriters v. Farm Bureau Mut.*

tus of Lori's early possession of the pickup. Although the Johnsons had full-time access to the vehicle prior to Kessler's stated intention, Heather argues it was not "acquired" before then because the Johnsons were merely testing the pickup to determine whether they wished to keep it.

*Ins. Co.,* 257 Iowa 56, 131 N.W.2d 265 [(1964)]. Section 321.45(2), on the other hand, is the provision which ordinarily applies between an alleged car owner and his own insurer. *E.g., Calhoun v. Farm Bureau Mut. Ins. Co.,* 255 Iowa 1375, 125 N.W.2d 121 [(1963)]. Thus, if an owner of a car sells and delivers it to a buyer, the buyer has a collision with a third person before the title certificate is assigned, and the third person asserts a damage claim against the seller, the seller is permitted to defend on the ground that he is not in fact the owner, by virtue of exception *d* in § 321.45(2) and the provisions of § 321.493. But between the seller and his own insurer, the title certificate controls the question of ownership since none of the exceptions in § 321.45(2) is applicable. *State Auto* and *Calhoun* cases, *supra. See also* Hudson, *Iowa Motor Vehicle Certificate of Title Law V,* 17 Drake L.Rev. 25, 27, 36.

191 N.W.2d 689, 692 (Iowa 1971). In this dispute, in which Heather stands in Lori's shoes in a dispute with an insurer, we think section 321.45(2) applies. Hence Lori cannot be considered to have acquired ownership of the pickup because title had not been transferred. Furthermore, even if we were to apply section 321.493 instead, Charles Kessler's stated intent to transfer the pickup was of no effect because he was not a titleholder authorized to effect a transfer. Heather's claim of coverage under the newly acquired vehicle provision was correctly rejected.

III. Heather also claims coverage under the doctrine of reasonable expectations based on Patrick Doyle's representation to Richard Johnson. It will be recalled that Doyle testified Johnson had asked him whether his daughters were covered under the policy if they were driving other people's cars, and he responded that the owner's insurance would be primary, but "if [the owner] did not have insurance, the Johnsons' insurance would probably take care of it." Heather notes however that Johnson testified he was told, without qualification, there would be coverage. She thus concludes a factual question was engendered which should have been submitted to the jury.

■ We first recognized the doctrine of reasonable expectations in *Rodman v. State Farm Mutual Automobile Insurance Co.* where we explained the rationale of the doctrine this way:

> While insurance policies and binders are contractual in nature, they are not ordinary contracts but are "contracts of adhesion" between parties not equally situated.... The company is expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the assured or prospective assured is a layman unversed in insurance provisions and practices. He justifiably places heavy reliance on the knowledge and good faith of the company and its representatives and they, in turn, are under correspondingly heavy responsibility to him.

208 N.W.2d 903, 905 (Iowa 1973) (quoting *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 208 A.2d 638, 644 (1965)). Thus form must not be exalted over substance, and the reasonable expectations of the insured may not be frustrated "even though painstaking study of the policy provisions would have negated those expectations." *Farm Bureau Mut. Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 112 (Iowa 1981) (citing *Rodman,* 208 N.W.2d at 906). The doctrine is nevertheless inapplicable if (1) an ordinary layperson would not misunderstand the policy's coverage as to this occurrence, and (2) there were no other circumstances attributable to the insurer at the time the policy was negotiated and issued that would foster coverage expectations. *See Rodman,* 208 N.W.2d at 908. Such circumstances may be shown if the policy exclusion: (a) is bizarre or oppressive, (b) eviscerates terms explicitly agreed to, or (c) eliminates the dominant purpose of the transaction. *Sandbulte,* 302 N.W.2d at 112 (citing Restatement (Second) of Contracts § 273 cmt. f, at 541 (1977)).

■ We cannot find the doctrine of reasonable expectations applicable to the facts here. The doctrine is applicable only to representations made by the insurer at the time of policy negotiation and issuance. *See Rodman,* 208 N.W.2d at 908 (expectations objectively reasonable only if based on insurance company conduct at time policy was issued);

*C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.,* 227 N.W.2d 169, 177 (Iowa 1975) (exclusion at issue involved an event the parties bargained for); *Sandbulte,* 302 N.W.2d at 112 (doctrine established by proof of underlying negotiations or inferred from surrounding circumstances). This requirement emphasizes the reliance interest upon which the doctrine is founded. Here Johnson did not testify as to the time or circumstances of his alleged conversations with his agents, the Doyles.

It was incumbent on Heather, as the party asserting the doctrine, to show, not only the expectations, but that they were relied upon by the insurance purchaser in deciding to buy the policy. *See* Iowa R.App.P. 14(f)(5) (burden of proof is ordinarily on the one who would suffer loss if the matter at issue were not established). Heather's failure to make any such showing renders the doctrine inapplicable. The trial court was correct in so holding.

IV. Heather's final assignment challenges the trial court's rejection of the bad-faith claim. Any bad-faith claim against an insurer presupposes a duty to defend. *Cf. Dolan v. Aid Ins. Co.,* 431 N.W.2d 790, 794 (Iowa 1988). For reasons we have already explained there was *no* duty to defend because there was no coverage under the policy. There is no merit in the assignment.

**AFFIRMED.**