DENNEY *v.* WASHINGTON NATIONAL
INSURANCE COMPANY

1. INSURANCE—PREMIUM RECEIPT—ADMISSIBILITY—ALTERATION.
   Insurance premium receipt which had been altered as to the amount received *held,* properly admitted as a non-suspicious instrument where evidence showed that correct amount to be inserted in receipt was not known by the insured's widow who was claiming rights under the policy.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 29 Am Jur 2d, Evidence §§ 866, 940.
[2] 29 Am Jur, Insurance § 137.
[3] 29 Am Jur, Insurance § 222 *et seq.*
[4] 29 Am Jur, Insurance § 245.
[5, 6] 29 Am Jur, Insurance § 199 *et seq.*

2. Same—Agency—Writing Agent—Statute.

A person who acts as a writing agent in a transaction between an insurance company and an insured is deemed in a controversy to be an agent of the company (CLS 1961, § 500.2220).

3. Same—Life Insurance—Verdicts and Findings. .

Finding of jury that insured had paid initial premium on policy of life insurance and was thus covered by policy at his death *held*, not beyond the great weight of the evidence where evidence disclosed that agent of company who prepared application for policy prepared the proof of claim and forwarded it to company without comment or question, and where letter by agent to his superior contained several admissions that full initial premium had been paid.

4. Same—Ambiguous Terms—Construction Against Insurer.

To the extent that terms of a conditional premium receipt are ambiguous to the average lay insurance applicant, they must be construed against the insurer.

5. Same—Life Insurance Policy—Presumption of Acceptance—Retention of Premium.

A life insurance company which receives an application for a policy of life insurance together with the initial premium therefor will be presumed to have accepted the offer if it retains the premium and fails to reject within a reasonable time.

6. Same—Life Insurance—Initial Premium—Medical Examination—Verdicts and Findings.

Submission to jury of question whether insurance company, by taking nonmedical application and accepting initial premium for policy of life insurance, had accepted the applicant's offer by failing to reject within a reasonable time while in the process of determining applicant's health of which it was suspicious *held*, not erroneous.

Appeal from Calhoun, Ryan (Ronald M.), J. Submitted Division 3 March 5, 1968, at Grand Rapids. (Docket No. 3,369.) Decided November 29, 1968.

Complaint by Shirley R. Denney against Washington National Insurance Company, an Illinois corporation, for sums due under contract of insur-

ance.   Verdict and judgment for plaintiff.   Defendant appeals.   Affirmed.

*Wagner & Greene,* for plaintiff.

*Allen, Worth & Calderone,* for defendant.

McINTYRE, J.   This is an action filed by the widow of the deceased upon an alleged contract for life insurance.   Admittedly, the policy was never issued or delivered, but an application was prepared and signed December 10, 1962, and a disputed receipt was given for the initial premium.   The alleged insured died in an automobile accident January 5, 1963, less than a month after the application.

The application was on a so-called nonmedical basis permitted under the rules of the defendant company for a person within the age group of the applicant and within the monetary limits of the policy application.

It became readily apparent by the pleadings that the defense contended the initial premium was not paid with the application and that the deceased was not insurable under the rules of the company, requirements specified on the reverse side of a premium receipt issued by the writing agent on December 15, 1962.   The terms and conditions are set forth in a footnote.[1]

---

[1]                   TERMS AND CONDITIONS

1. If the entire first premium for the insurance applied for in the application bearing the same date and number on this receipt is paid with the application and is shown as the amount paid in the application and on this receipt, and if the Company shall be satisfied that on the date of application or the date of the medical examination (if required), whichever is the later date, the Proposed Insured and the Applicant for the Purchaser Waiver of Premium Benefit, if any, were insurable under the Company's rules governing the acceptance of risks at the classification and for the amount and plan of insurance

The case was tried before a jury. At the conclu-clusion of plaintiff's case motion was made for a directed verdict on the basis that the plaintiff did not make a *prima facie* case. The court deferred decision on the motion and defense renewed the motion at the conclusion of all of the testimony. Again the court reserved decision. The jury rendered a verdict for the plaintiff in the sum of $10,000. Defendant then filed a motion for judgment notwithstanding the verdict and in lieu of the granting of that motion a motion for a new trial. These motions were denied by the trial judge in two sets of written findings and appeal is taken to this court on such denial.

Three issues are raised on appeal, the first being whether the trial court committed reversible error in admitting into evidence a receipt which purported

---

applied for, the insurance applied for shall be in force in accordance with the provisions of the policy from the date of the application or the date of the medical examination (if required), whichever is the later date. However, the amount of insurance becoming effective under this receipt is hereby limited to the extent that in the event of the death of Proposed Insured or of the Applicant for the Purchaser Waiver of Premium Benefit, if any, the total liability of the Company shall not exceed $100,000 inclusive of life insurance then in force on such person with the Company and any additional benefits payable by the Company as a result of accidental death.

2. If the entire first premium for the insurance applied for is not paid with the application or if the Company declines to issue the insurance as applied for but issues a policy on a plan or on terms other than applied for, the Company shall incur no liability until a policy is delivered to and accepted by the Applicant and the entire first premium is actually paid while the Proposed Insured and the Applicant for the Purchaser Waiver of Premium Benefit, if any, are in good health, and then only if they have not consulted, been examined, or been treated by a physician or practitioner since the completion of Parts 1 and 2 of the application, and if so delivered to and accepted by the Applicant, the policy shall be deemed to have taken effect as of its Date of Issue.

3. The Company shall have 60 days from the date of this receipt within which to consider and act upon the application, and if within such period a policy has not been received by the Applicant or if notice of approval or rejection has not been given, then the Application shall be deemed to have been declined by the Company, and the amount paid shall be returned upon surrender of this receipt.

4. Any changes or alterations in these terms and conditions will render this receipt void.

to show payment of the initial premium, the second whether the verdict of the jury was contrary to the great weight of the evidence, and the third whether there was legally sufficient evidence to support a finding that the company failed to act with reasonable promptness in determining whether a demand should be made for a medical examination of the deceased.

The challenged receipt was a part of the policy application and could be readily detached by tearing it from the application through a perforated line. The receipt was titled "Conditional Premium Receipt". A space was provided in the body of the policy application for the insertion of a figure representing the amount paid with the application, and this space had been filled in with the figure $5. Upon the original preparation of the receipt portion of the application it appeared that either the amount $5 or the amount $5.60 had been shown as received, however the receipt was altered at the time it was proffered as plaintiff's Exhibit #1, to read $14.60. Lines had been drawn through the original figure inserted in the receipt in such a manner that the agent of the company who prepared the receipt could not himself discern whether the original figure had been $5 or $5.60.

The evidence is quite undisputed that at the time of the preparation of the application the deceased had no money with which to make a payment. On December 15, 1962, he gave the writing agent the sum of $5 and on December 22, 1962, he gave the agent the sum of $9, or perhaps $9.60, and received another receipt which was captioned "Washington National Insurance Company. Temporary Conditional Receipt. Evanston, Illinois." It read: "Received from Robert Boster, $9." This was received in evidence as plaintiff's Exhibit #2.

It is not clear from the evidence in this case just when and where the perforated receipt was detached and given to the deceased, however it is quite clear that the receipt was found in his personal effects after his death. Under the $10,000 policy which was applied for, the initial quarterly premium required by the company was $14.60. Under the terms and conditions of plaintiff's Exhibit #1, if the entire first premium for the insurance was paid with the application and if the company was satisfied that the applicant was insurable on the date of the application or on the date of a medical examination if the company so ordered, the insurance would have been in effect as of the date of the application or the medical examination, whichever was of the later date. These were in effect the basic factual questions submitted to the jury and in its verdict the jury decided that the conditions had been met.

The chief contention of the defense is that the perforated receipt should not have been received in evidence because it was altered and unless and until the plaintiff could explain the alterations, the instrument should be excluded. This claim is based upon the theory that a common law legal presumption exists to the effect that an altered instrument was altered after execution and the party offering the instrument has the burden of removing this presumption before the instrument itself can be considered. Michigan support for this doctrine is cited by the defense as *Samberg* v. *American Express Co.* (1904), 136 Mich 639, 641:

"It has been held that if, on the production of an instrument in court, it appears to have been altered, the party offering it must explain this appearance (1 Greenl Ev § 564) ; that such alterations discredit the instrument unless removed (*Henman* v. *Dickinson*

[1828], 5 Bing 183 [130 Eng. Rep. 1031]; *Gillett* v. *Sweat* [1844], 6 Ill 475)."

Research does not disclose that this case has ever been cited as authority that the State of Michigan adheres to the doctrine that the presumption requires a party to explain an alteration before an instrument can be received into evidence. The case is mentioned in an ALR commentary, 110 ALR 976, 980, but as authority for the proposition that a bank need not pay a cashier's check, nor an express company pay a traveler's check when the countersignature is not made in the manner agreed upon. The countersignature in *Samberg, supra,* appeared with a line drawn through it and the principal reason for the decision was that a signature which was lined out was indeed no signature at all, and that such a line was frequently used to delete or cancel whatever had been originally written. This Court cannot broaden the concept of *Samberg* to enunciate a generalized doctrine that no altered instrument can be received into evidence unless and until the alteration is explained by the offering party. Nor can this Court extend *Wilson* v. *Hotchkiss Estate* (1890), 81 Mich 172, to forbid admission of the receipt in the case at bar. Consider the statement of the court in *Wilson* at p 178:

"The distinction is made between instruments in which the alterations, interpolations, or erasures appear upon their face to be suspicious, and those in which no suspicion is raised from inspection. In the latter case the alteration is presumed to have been made before execution. In the former, explanatory testimony must be given before they are admissible in evidence. Alterations, interpolations, or erasures are suspicious, upon the face of the instruments when they appear to be beneficial to the person or party claiming rights under them. After they are

admitted in evidence, whether the alteration or inter-
polation was made before or after execution becomes
a question of fact for the jury."

This portion of the opinion might well be dictum
because *Wilson* was reversed upon errors in the
charge and a refusal to charge as to matters not con-
cerning the question of alteration of instruments.
We hold that the premium receipt was not "suspi-
cious" within the meaning of *Wilson,* despite an al-
teration, because of testimony by the writing agent
and the beneficiary that the amount of the original
quarterly premium was not revealed to anyone but
the deceased, and he is not a party now claiming
rights under the instrument. Since he could hardly
have anticipated his sudden accidental death, evil
intent could not have been attributed to him to moti-
vate alteration. Evidence disclosed the widow would
not know which figure to insert to constitute an
initial quarterly premium. The fact that testimony
qualifying the receipt came to light after the in-
strument was actually received in evidence may
have been technical error but certainly not prejudi-
cial error.

The presumption that an instrument was altered
after execution holds little support according to 4
Am Jur 2d, Alteration of Instruments, § 82, p 77.

"Some authorities modify this rule to the extent
of holding that a presumption that any alteration
was made after execution arises only in cases where
the circumstances are suspicious; but this attempt at
an intermediate or compromise rule has been object-
ed to as furnishing no definite rule by which to de-
termine when the burden is upon the holder to ex-
plain the alteration and when it is not, and as being
simply an inference of fact drawn from the evidence
in the case."

In the following paragraph, 4 Am Jur 2d, Alteration of Instruments, § 83, pp 77, 78, we find:

"Still another doctrine supported by numerous decisions is that no presumption arises from an alteration apparent upon the face of an instrument, but that the entire question of time when such alteration was made is for the jury to consider in the light of all of the evidence intrinsic and extrinsic. Theoretically, where this doctrine prevails, it will not be affected by the fact that the alteration is suspicious, but in actual practice it seems from many of the cases supporting the doctrine that the nature of the alteration as suspicious or otherwise is of no little importance."

This Court is not overruling *Samberg, supra,* within the limited scope of its application, but rather adopts a common sense approach that all of the facts and circumstances surrounding a questioned document should be developed by the evidence and that the fact finder must arrive at a conclusion based upon the preponderance of the proof without the benefit of a presumption. The trial court properly received plaintiff's Exhibit #1, into evidence; had it not done so, no testimony could have been adduced concerning its preparation. Modern case law is rife with indications that the courts of our land are placing increasing reliance upon the ability of jurymen to apply intelligent construction upon evidence in arriving at a fair verdict.

The verdict of the jury in this case was not beyond the great weight of the evidence. A review of the entire trial transcript reveals many excerpts from the testimony which would justify a conclusion by the jury that the initial premium had been paid with the application. Particularly telling was the testimony of the writing agent, who under law of this state is deemed in a controversy to be an agent

of the company, CLS 1961, § 500.2220 (Stat Ann 1957 Rev § 24.12220). The agent prepared the proof of claim and forwarded it with the original receipt without making comment as to any question concerning its authenticity or sufficiency. He had previously insured the deceased with the same company on a different type of insurance policy. He was obviously uncertain in the course of his testimony concerning the preparation of the various portions of the receipt. Plaintiff's Exhibit #6 is a letter written by the insurance agent to his superior, and dated January 11, 1963. It contains several admissions that the full initial premium had been paid and of particular significance is that portion of the letter which reads as follows:

"Mr. Riekse this was a terrible accident and I understand the company's procedures on the collecting of the full initial premium, but I do also personally feel that this accident happened after all of the premiums were collected and if the man was in good health and would have been issued a policy, I feel we are responsible."

Although this exhibit was objected to as being immaterial, its materiality was quite evident.

These matters, and others contained in the lengthy trial transcript, convince this Court upon review that the jury was justified in its finding.

Finally we are concerned upon appeal with the question whether the company acted with reasonable promptness in determining whether a demand should be made for a medical examination of the deceased. A fair reading of the conditional premium receipt, plaintiff's Exhibit #1, reproduced in a footnote herein, convinces this Court that the average lay insurance applicant would have at least some difficulty in understanding what it meant. To this

extent the terms must be construed against the company. This Court agrees with the opinion of the trial judge in his amended ruling on a motion for judgment notwithstanding the verdict and for a new trial when he states:

"*  *  *  the application for insurance in this case was submitted to the company as a non-medical application. This means that no medical examination of the applicant would be required. The company had the right to accept or reject this application. If the company desired to have a medical examination of the deceased it was the duty of the company to act with reasonable promptness. *  *  * If the quarterly premium was paid, plaintiff's decedent had the benefit of interim insurance until the demand was made for a medical examination within a reasonable time after the application was received."

In *Gorham* v. *Peerless Life Insurance Company* (1962), 368 Mich 335, it was ruled that:

"A life insurance company which receives an application for accident insurance together with the initial premium therefor will be presumed to have accepted the offer if it retains the premium and fails to reject within a reasonable time."  (Syllabus 1.)

Admittedly, the company was in the process of determining the health of the applicant at the time of his death, but had not made a demand for a medical examination. The company was suspicious because of the presence of a coin lesion reported by a physician who had attended the deceased in the past. Had the company made a demand for a medical examination, it is doubtful whether the report could have been completed and a determination made before the accidental death which occurred. The full matter was submitted to the jury under careful

and competent instruction and a verdict entered for the plaintiff. We cannot see error here.

The recent case of *Trotter* v. *Prudential Insurance Company of America, Inc.* (1965), 374 Mich 682, has no application here. In that case there was no pretense that the original premium was paid with the application. *Smiley* v. *Prudential Insurance Company of America* (1948), 321 Mich 60, likewise has no application because the contract was in different form.

Affirmed, costs to appellee.

HOLBROOK, P. J., and QUINN, J., concurred.