DENISE C. SIMSES *v.* NORTH AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE

HOUSE, C. J., COTTER, LOISELLE, BOGDANSKI and LONGO, Js.

Argued January 3—decision released May 2, 1978

*Charles W. Page,* for the appellant (defendant).

*Richard F. Oburchay,* for the appellee (plaintiff).

LOISELLE, J. The plaintiff, wife of the decedent Richard J. Simses, brought suit in the Superior Court to recover the proceeds due her as the beneficiary of a $30,000 life insurance policy allegedly issued to the decedent by the defendant. From a judgment in favor of the plaintiff, the defendant has appealed to this court.

The facts as found by the court are in part as follows: In 1970, the defendant circulated brochures offering group life insurance to the American Society of Oral Surgeons. The brochure read, in part: "Generally, contracts of $100,000 will be issued on the basis of a non-medical questionnaire to eligible members under age 51. However, the Company reserves the right to require medical evidence of insurability at all times, except when 'Guarantee Issue' is effective."[1] The group plan was administered by Treloar and Heisel, Inc., and Daniel Treloar dealt with oral surgeons throughout the country in an effort to sell the policy. The decedent, Simses, an oral surgeon, submitted an application, at the same time paying the semi-annual premium of $121 designated in a so-called plan "A" basic term plan for $30,000 life insurance coverage, a plan allowing for a minimum coverage of $10,000 and a maximum coverage of $30,000. The application was stamped received by Treloar on December 21, 1970, and then forwarded to the defendant's home office. A receipt was tendered to Simses on December 22, 1970. An underwriting memo which stated, "Application approved standard. Policy follows," was sent by the defendant's

---

[1] The brochure does not specifically define "guarantee issue" although it can be inferred from the information provided that this refers to a $10,000 policy, applied for by one under age 51, within the time limit specified in the brochure.

authorized agent, Edward Dedrick, to Treloar on December 29, 1970. This data sheet included the comment that a statement of medical treatment had been sent for, and that the inspection report had been ordered, but not received. The statement subsequently sent to the defendant by Simses' physician, Milton Cooper, described a history of some hypertension, for which medication had been prescribed, and concluded "excellent health at present." On January 6, 1971, a certificate of insurance in the amount of $30,000 was prepared for "pre-issue" at the defendant's home office.

On January 19, 1971, Simses died while attending an oral surgeon's convention in Chicago, Illinois. On January 27, 1971, Edmund A. Smith, the defendant's second vice president for underwriting, wrote to Treloar requesting that he return the certificates of insurance for cancellation. Two days later, Smith wrote to Richard Resnick, the decedent's partner, approving the claim for $10,000 guaranteed issue and refunding the advanced excess premium. An insurance certificate was subsequently issued for $10,000 with an effective date of December 14, 1970. At no time prior to Simses' death was anyone notified that his application for the $30,000 policy had been rejected.

The findings further reveal that during the course of the trial Smith testified that he first reviewed Simses' file on January 18, 1971, and that he then approved it for the guaranteed issue of $10,000. Smith testified that he marked the application "standard," an abbreviated notation that it was a "final rating." The court credited neither of these statements. The facts do reveal, however,

that Smith, at some point, wrote on the underwriting data sheet "Impaired risk. Issue Guar. Issue. Treloar will return cert.," but the notation was undated. Similarly, Smith, at some point, crossed out the amount of coverage which Simses sought on his application. Finally, in another undated notation, Smith wrote on the underwriting data sheet, "Applicant died on 1-18-71 [or 1-19-71] as per D. Treloar," a notation initialed by him.

On the basis of these facts, the court concluded that the plaintiff, beneficiary under the policy, was entitled to collect $30,000, plus interest and costs from the defendant. It is from this judgment that the defendant appeals, claiming that the only policy in effect at the time of Simses' death was the guaranteed issue for $10,000.

Central to a resolution of the dispute in this case are the terms specified in the application for insurance submitted by Simses, and the provisions of the receipt tendered to him upon payment of the first premium. The application provided, in part, that the policy "shall not be considered in force until an individual policy or certificate . . . shall have been issued by the Company . . . except that if the first full premium is paid in advance . . . and the receipt on the form attached hereto delivered to the Applicant then the liability of the Company shall be as stated in such receipt." It is, therefore, clear that the defendant's liability must be determined by reference to the receipt which Dr. Simses received on December 22, 1970.

The face of the receipt specifies that it is to be detached from the application only upon payment of the first premium. The reverse side carries the

following inscription in extremely small print under the caption, "Conditions of Receipt: First—The insurance, subject to the terms and conditions of the insurance applied for shall take effect on the date hereof provided: (1) a later effective date is not requested in the application, (2) the required and completed applications and the report of any medical examination, and such other information as may be required by the Company are received by the Company at its Home Office, (3) the Applicant is on this date acceptable to the Company under its rules and practices as a standard risk on the plan and for the amount applied for; otherwise, the payment evidenced hereby shall be returned upon demand and surrender of this receipt. In any event, the amount of insurance becoming effective under the terms hereof as a binding receipt is hereby limited to the extent that in the event of the death of the Applicant the total liability of . . . ." In the following paragraph, entitled "Second," the receipt continues with the language, "This receipt shall operate as a Conditional Receipt if the insurance is not effective coincident herewith under the exact conditions heretofore stipulated. If the Applicant is not acceptable to the Company under its rules and practices as a standard risk, or insurance differing in form or amount from that applied for or with an extra premium is offered, no insurance shall be considered in effect under the application herein referred to unless and until the full first premium is paid and the policy or certificate is actually delivered to and accepted by the Applicant, while the state of health of the Applicant is as stated in the application."

Although this court has not before been specifically confronted with the effect to be given a

"binding" insurance receipt,[2] such receipts have been the subject of abundant litigation in other courts; see, e.g., annot., 2 A.L.R.2d 943; 1 Couch, Insurance (2d Ed.) §§ 14:39–14:46; as well as of extensive legal commentary. See comment, "Life Insurance Receipts: The Mystery of the Non-Binding Binder," 63 Yale L.J. 523; comment, "Operation of Binding Receipts in Life Insurance," 44 Yale L.J. 1223; recent cases, 60 Harv. L. Rev. 1164; comment, " 'Binding Receipts' in California," 7 Stan. L. Rev. 292; 7 Williston, Contracts (3d Ed.) § 902A. The simple question created by such receipts is "What effect do they have?" While the specific terminology on the receipts may vary, a common factual situation gives rise to the repeated question. A life insurance policy does not ordinarily take effect until the policy is delivered. Vance, Insurance (3d Ed.) §§ 35, 42. Applications for insurance often provide, however, that if the first full premium is paid, the insurance policy will come into force as of the date of the application. Were this the end of the verbiage, case reports and law journals would be thinner. The problem arises from the fact that, generally, additional terms are added, qualifying this assurance—and it is those terms which give rise to doubt and confusion as to whether the policy does, in fact, take effect at that time.

The use of such "binding" receipts is, however, common and results from the fact that an application for insurance is simply an offer, revocable at any time prior to acceptance. *Swentusky* v. *Pruden-*

[2] Two early cases of this court involved issues relating to "binding" receipts, but neither involved an interpretation of the effect of such receipts. See *Sheldon* v. *Connecticut Mutual Life Ins. Co.*, 25 Conn. 207, and *Swentusky* v. *Prudential Ins. Co.*, 116 Conn. 526, 165 A. 686.

*tial Ins. Co.*, 116 Conn. 526, 534, 165 A. 686. In order to protect themselves from an applicant's change of mind, which often leads to financial losses due to the insurance company's expenditures on investigating the applicant, the companies developed prepayment policies. *Simpson* v. *Prudential Ins. Co. of America*, 227 Md. 393, 399–400, 177 A.2d 417; comment, op. cit., 63 Yale L.J. 523; 7 Williston, op. cit. § 902A. The terms of the application suggesting that early payment of the premium accelerates the date of effective coverage serve to induce applicants to accept this option. Obviously, by so doing, the applicant is under the impression that some advantage accrues to him. As the court in *Hart* v. *Travelers Ins. Co.*, 236 App. Div. 309, 258 N.Y.S. 711, aff'd, 261 N.Y. 563, 185 N.E. 739, noted (p. 315): "[The applicant] did not believe that by furnishing this premium in full in advance he was doing something to his disadvantage—paying money for a period when he was not insured at all."

In attempting to analyze the various types of "binding" receipts, commentators and courts have tended to categorize them into two or three types. See *Simpson* v. *Prudential Ins. Co. of America*, supra, 401; comment, op. cit., 63 Yale L.J. 523, 528 and n.59; 7 Williston, op. cit. § 902A. The approval, or illusory, type of binder provides that the policy takes effect as of the date of the binder with the added proviso that the application must first be accepted by the company. The postponed coverage or condition precedent type of binder creates an immediate contract, but coverage does not take effect until the company is satisfied that the risk is acceptable. The real effect of such binding receipt is to give a company a premium for a space of time during which the applicant is not

covered. The immediate coverage or condition subsequent type of binder actually binds the company as of the time the receipt is signed, but permits the company to terminate the policy upon a determination that the risk is too great. 7 Williston, op. cit. § 902A. Although courts have taken various approaches in determining the effect of specific receipts, the most common involves analysis of the particular terms in question. See 1 Couch, Insurance § 14:35.

In the present case, it is unquestioned that the applicable law is that of Connecticut. Under our law, the terms of an insurance policy are to be construed according to the general rules of contract construction. See, e.g., *Weingarten* v. *Allstate Ins. Co.,* 169 Conn. 502, 509–10, 363 A.2d 1055; *A. M. Larson Co.* v. *Lawlor Ins. Agency, Inc.,* 153 Conn. 618, 622, 220 A.2d 32. "The determinative question is the intent of the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy." *Marcolini* v. *Allstate Ins. Co.,* 160 Conn. 280, 283, 278 A.2d 796. If the terms of the policy are clear and unambiguous, then the " 'language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning.' " *Weingarten* v. *Allstate Ins. Co.,* supra, 509. However, "[w]hen the words of an insurance contract are, without violence, susceptible of two interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted." *Raffel* v. *Travelers Indemnity Co.,* 141 Conn. 389, 392, 106 A.2d 716; see also 4 Williston, Contracts (3d Ed.) § 621.

This rule—that the construction most favorable to the insured be adopted—"rests upon the ground

that the company's attorneys, officers or agents prepared the policy, and it is its language that must be interpreted." *Roby* v. *Connecticut General Life Ins. Co.,* 166 Conn. 395, 402, 349 A.2d 838. The rule itself derives from the established principle of contract construction that, where the terms of a contract are equally susceptible to two different meanings, that favoring the party who did not draw up the contract will be applied. "The premise operating behind the rule would seem to be a psychological one. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests." *Ravitch* v. *Stollman Poultry Farms, Inc.,* 165 Conn. 135, 146 n.8, 328 A.2d 711. A further, related rationale for the rule is that "[s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter." 4 Williston, op. cit. § 621, p. 760.

In the present case, the application form filled out by Simses clearly specifies that the policy shall not take effect until the policy or certificate has been issued by the company *unless* the first premium has been paid, in which case, the policy is to take effect in accordance with the terms on the receipt. The first and most prominent paragraph of the receipt reveals that the policy is to take effect on the date noted upon it, "provided" the noted three "conditions" exist, the last being that the "[a]pplicant is on this date acceptable to the Company under its rules and practices as a standard risk on the plan." "[O]therwise," the

inscription continues, "the payment evidenced hereby shall be returned upon demand and surrender of this receipt." The defendant argues that this provision of the receipt cannot reasonably be construed to mean that temporary coverage came into effect until notification to the contrary. By so arguing, the defendant assumes that the word "provided" connotes the following three qualifiers as conditions precedent to its liability.

While it is true that the term points toward such a condition, it is not determinative, the real question being "the intent of the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy"; *Marcolini* v. *Allstate Ins. Co.*, supra, 283; or, in this case, when the plaintiff reasonably expected the policy to take effect and when it was to be effectuated as disclosed by the receipt. See, e.g., *Allen* v. *Metropolitan Life Ins. Co.*, 44 N.J. 294, 304, 208 A.2d 638. Whether a proviso constitutes a condition precedent, a condition subsequent, or simply a covenant is to be determined with reference to the intent of the parties in light of the terminology as a whole and surrounding circumstances. *Luttinger* v. *Rosen*, 164 Conn. 45, 46, 316 A.2d 757; see also *Green County* v. *Quinlan*, 211 U.S. 582, 594, 29 S. Ct. 162, 53 L. Ed. 335; *Southern Surety Co.* v. *MacMillan Co.*, 58 F.2d 541 (10th Cir.).

The use of the term "otherwise" in the receipt tends to suggest, to the lay person, trained in neither law nor underwriting, that two alternatives exist: either the policy is in effect or the premium will be returned in exchange for the receipt. This latter alternative presupposes notice to the appli-

cant. A reasonable reading of the clause as a whole suggests that the policy is in force until the company notifies the applicant that it has terminated coverage upon a determination that the applicant has not met the required standards. In legal terms, the conditions are, then, conditions subsequent, permitting the insurer to terminate the policy prior to issuance of the certificate. See *Ransom* v. *Penn Mutual Life Ins. Co.*, 43 Cal. 2d 420, 274 P.2d 633; *Allen* v. *Metropolitan Life Ins. Co.*, supra.

Relying heavily on the second paragraph of the receipt, the defendant argues that "where, as here, the applicant is not acceptable to the company under its rules and practices as a standard risk, no insurance is in effect until the first full premium is paid and the policy or certificate is actually delivered to and accepted by the applicant while the state of health is as stated in the application." We cannot agree, however, that the language of the second paragraph clearly conveys this. Even to one versed in the law, the initial sentence, "This receipt shall operate as a Conditional Receipt if the insurance is not effective coincident herewith under the exact conditions heretofore stipulated," lacks a certain clarity. The following sentence, freer of technical terms yet no less ambiguous, may reasonably be read to mean that *if* the company notifies the applicant that he is not a standard risk, or, that the company is counter offering insurance on terms other than those applied for, then the insurance will not take effect until the policy or certificate is delivered.[3]

---

[3] This determination that the "conditions" specified in the receipt constitute conditions subsequent does no violence to this court's opinion in *Swentusky* v. *Prudential Ins. Co.*, 116 Conn. 526, 531, 165 A. 686, in which this court stated that "Swentusky did not pay the 'full first premium' which is made a condition precedent to the promises of the defendant." In the present case, Simses paid

Such an interpretation of the receipt as a whole is reasonable in light of the words used as they could validly be understood by Simses in light of the surrounding circumstances. Because the application so clearly conveys that the policy would not take effect until issued *unless* the first premium was paid, an applicant's likely response would be to assume that if the first premium were paid, coverage would come into immediate effect. The words of the receipt do not clearly counter this assumption. The applicant could well assume that if he, having paid the first full premium, not having requested a later date, having submitted all the requested data, and having honestly answered the detailed questions on the application, a temporary policy would take effect, even in the absence of a physical examination,[4] until future notice or issuance of the formal policy. Such an assumption is particularly warranted in view of the fact that the insurance company had the opportunity to peruse the application before sending out the receipt. It was, therefore, on notice as to potential health problems of the applicant and, had it so chosen, could have returned the premium to the applicant pending further investigation. Furthermore, had the company wished

the first full premium, which, according to our reading, brought the policy into temporary effect pending notification to the contrary or delivery of the actual policy. It is also worthy of note that the action in *Swentusky* was brought in negligence, the court specifically stating (p. 531) that "[t]his action is not brought in contract, and that makes it unnecessary to discuss the question whether any liability based upon contract might arise in such situation as the one before us."

[4] Simses' application reveals that at the time it was submitted he was forty-six years old. The brochure circulated to oral surgeons indicated that, although the company reserved the right to require medical evidence of insurability, "contracts of $100,000 will be issued on the basis of a non-medical questionnaire to eligible members under age 51."

to state, as the defendant claims, that the policy would not take effect until the company actually determined that the applicant was a "standard risk" it could easily have done so in exacting language. Because it chose, rather, to create an ambiguity which would not jar an applicant to any awareness that perhaps, despite appearances, coverage was *not* immediately effective, the defendant must "bear the burden of any resulting confusion." *Gaunt* v. *John Hancock Mutual Life Ins. Co.,* 160 F.2d 599, 602 (2d Cir.).

We, therefore, hold that the "binding" receipt tendered to Simses effectively brought into force the $30,000 policy applied for, and that that policy was in effect at the time of his death. Had the defendant notified Simses prior to his death that he was found not to be an "acceptable" risk, the policy would have terminated. The court found otherwise and the defendant neither contests this nor claims that Simses misrepresented his health history on the application. On the basis of this determination, the defendant's claim that Simses was not an acceptable risk, a suggestion not, in any case, supported by the findings, is irrelevant. The court's conclusion that the plaintiff, beneficiary under the policy, is entitled to collect $30,000, plus interest from April 7, 1971, and costs, must stand.

There is no error.

In this opinion the other judges concurred.