VICTORIA ARMSTRONG, Plaintiff-Appellee, *v.* UNITED INSURANCE COMPANY OF AMERICA, Defendant-Appellant.

First District (4th Division)    No. 80-84

Opinion filed July 30, 1981.

Peterson, Ross, Schloerb & Seidel, of Chicago (Joseph J. Hasman, Ellen J. Kerschner, and D. Varraveto, Jr., of counsel), for appellant.

Louis S. Elovitz, of Rotman, Medansky & Elovitz, Ltd., of Chicago, for appellee.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Plaintiff's husband, Curtis Armstrong, applied for a life insurance policy from Michael Yarbrough, a licensed insurance agent of defendant United Insurance Company of America (United—insurer), paid the first

premium and received a conditional receipt. He died that night in an automobile accident. There has been no suggestion that the applicant's physical condition contributed in any way either to the accident or to his death. The insurance company denied liability, contending at trial that the agent had no authority to bind coverage, or to waive any provisions in the application; that the application provided that the policy had to be issued during the lifetime of the applicant; that the insurance company required a medical examination; and that at no time was there a completed contract between the applicant and the insurance company. After hearing the evidence, the trial court found that there had been a binding contract of insurance in effect at the time of the applicant's death. Specifically, the trial court made the following findings among others:

1. the conditional receipt was issued with the full authority and consent of United;

2. prior to the accident in question, applicant was in excellent health;

3. United made no attempt of any kind to check applicant's medical history and background although it had a duty to do so and could have done so;

4. applicant was regularly employed and scheduled to report to play professional football within two weeks of his death. His wife was employed and applicant's past work record demonstrated an ability to pay for insurance in the future;

5. there was nothing in the application which would disqualify applicant from being insured by United;

6. applicant changed his position by taking this insurance and not seeking insurance elsewhere as he had planned to do.

United has appealed contending that there is no insurance because the application was never accepted or approved by United, and because applicant was not insurable under United's ordinary underwriting rules, since he was unemployed and there was no medical examination. United further contends that most of the court's findings of facts are unsupported by the evidence. We find no error and affirm.

The application dated March 1, 1973, revealed that Curtis Armstrong was 24 years of age, 6 feet 2 inches tall and weighed 195 pounds. He had had no serious illnesses, and the health of his parents, brothers and sisters was all good. He had never been refused insurance. His occupation was listed as "training for pro football player." The agent added that Curtis had not turned professional and wanted to get his insurance at a standard price. The application further provided that "Except as may be provided in a Conditional Receipt bearing the same date as this application, the Company shall incur no liability under this application until it has been (a) received in and approved by the Home Office and (b) a policy has been

issued and delivered to me [applicant] and the full first premium has been paid by me and accepted by the Company during my lifetime and my continued insurability, according to the Company rules." Unlike many applications, there was no nonwaiver provision in this application limiting the agent's authority either to make explanations or to waive any provisions of the application.

The conditional receipt provided in relevant part:

"(1) If the application is not accepted by the Company and a policy not issued and delivered, the above amount will be returned to the applicant.

(2) If the above amount equals the full first premium as specified in the application and is received with the application and the application is approved as submitted, the policy applied for shall be in force from the date of the application."

At trial, Michael Yarbrough, the plaintiff, and Julius Collier, called under section 60, testified for the plaintiff. Andrew Davis, Iler Brady and Julius Collier, all employees or former employees of United, testified for the defendant.

Yarbrough was the agent who took the application. He started working with United in 1969 and was terminated in April 1973 for unspecified reasons. In 1973 his manager was Andrew Davis.

When Yarbrough started working at United he underwent training which included viewing movies and attending meetings. At times the managers would go out with him to see how he approached people, how he "sold" them after having an interview, and to see "he was doing the right thing." There were weekly meetings at the office where sales techniques were discussed. As part of the sales talk they were instructed to tell prospective purchasers of insurance that there would be immediate coverage upon the payment of the first month's premium and the issuance of a conditional receipt. Both Davis and Collier told him this. Prior to March 1, 1973, Yarbrough had used this technique in making other sales. Yarbrough added that at no time did the company refuse an application he had taken.

Yarbrough saw the Armstrongs while he, Yarbrough, was in the hospital on March 1, 1973, at about 3 p.m. It was a pre-arranged meeting. The meeting lasted about 45 minutes to 1 hour. Yarbrough had an application and the rate book with him. One reason Yarbrough wanted to see the Armstrongs was that the applicant was getting ready to go south somewhere to play professional football. Yarbrough expressed to him the importance of taking out insurance before he turned professional because, so Yarbrough claimed, as a professional the premiums were higher. Furthermore, the insurance was important because applicant was a married man and his wife was pregnant.

Applicant on March 1 appeared to Yarbrough to be very strong and in good health. Based on his knowledge of applicant and his physical condition and how United operated and issued policies, he believed a policy would have been issued and that "the only time they did not approve is when they found out the man was dead." Yarbrough agreed that when the application was taken applicant was not employed but was getting ready to go to Denver to play football for the Denver Broncos. He was also playing semi-pro ball. Yarbrough denied that he was familiar with any rule that United would not issue $20,000 life insurance to persons who were unemployed. He also stated that as far as he knew there were no nonmedical limits on ordinary life insurance although there were on industrial insurance. He sold the applicant ordinary life insurance. On cross-examination, when he was confronted with the bulletin setting forth the limits of insurance that would be issued without a medical examination ($15,000), he claimed he could have written two applications. However he did not.

After Yarbrough explained to the Armstrongs the amount of coverage applicant was taking and the immediate coverage he was going to have, they decided to take the insurance. In answer to counsel's question as to what he meant by "the immediate coverage he was going to have," Yarbrough testified: "Ordinarily in insurance, if you talk to a client and get the client to buy the insurance, they agree to buy the insurance from you and pay the one month premium, you in turn give them a conditional receipt and they are covered at that point. And that's what I explained to him before he left." He told them they would be covered for anything except illness. Yarbrough read the conditional receipt to them and told them what it meant—that they would have insurance immediately if they did not have any illnesses. He also read parts of the application to them, including the part which said that except as provided in the conditional binder, there would be no coverage until the policy was issued and the premium paid. Again, however, Yarbrough assured them that the applicant was covered.

The application was in the agent's handwriting. Plaintiff signed her husband's name because, so Yarbrough testified, applicant had injured his hand in the practice of a football game. After the application was filled out and signed, the agent put it in his drawer. He called his manager, Davis, and told him he had insured the applicant. Davis did not tell him he could not do that.

Yarbrough delivered the application to the company on the following Monday. He did not, at that time, know that the applicant was dead.

The plaintiff testified that she married the applicant on September 18, 1971. Up until the date of his death he was employed; he had never been unemployed for more than one month. The year before his death he

had been a supervisor at Hall Printing Company. He had been laid off from Hall about a month before his death. But he was also on a semi-pro football team which played on the southwest side. He played every Sunday and was paid for the games by the coach after the game. The last time he played was the Sunday before he died. Plaintiff also testified that at the time the applicant died he was under contract with the Denver Broncos' football team and was scheduled to report approximately two weeks later. She did not have a copy of the contract. He had not yet received any payment from the Broncos but he was working for them. She explained the statement on the application that "He have [sic] not turned professional" saying that he had not actually reported to Denver so he was not assuming he was definitely professional until he got there.

On March 1, applicant was not working other than training. He was running, exercising and playing basketball. He exercised at home about three or four hours a day and also went to Navy Pier to exercise. On the date of his death he was not suffering from any illnesses. He had injured his hand lifting weights and had wrapped it in brown elastic wrap.

Plaintiff was employed as an operator for Illinois Bell Telephone Company. Her health was good, although she was four months pregnant.

On March 1, 1973, they had an appointment to see another "guy" from another insurance company. But they decided to see Yarbrough, who was an associate of her father's at church, because they had previously made an appointment with him. If they agreed, they would take what he was offering; "if not, we would go with the other guy."

They saw Yarbrough at about 2 or 3 in the afternoon at the hospital. Yarbrough described the different plans. Plaintiff liked the monthly death payment plan offered. They asked him if they would be covered if something happened "today, tomorrow." He said yes, telling them, "You, will be covered as of when you leave here." He told them that if anything happened to applicant, he would be covered except for previous illness. Applicant was concerned about this since he was leaving in a couple of weeks. Yarbrough filled out the application and they read it. Plaintiff signed it for him because applicant did not want to sign it with his left hand. (He was right-handed.) Applicant then paid Yarbrough $37 and received a receipt. They glanced over the receipt. Before they left, Yarbrough again assured them that they were covered.

When asked on cross-examination what a conditional receipt meant to her she said "it means to me that it is something else that means [sic] to happen before the receipt is actually, quote, a receipt."

Julius Collier, a manager of United, was called under section 60 (Ill. Rev. Stat. 1977, ch. 110, par. 60), as plaintiff's final witness. He also testified for United. He had been an employee of United for nearly 18 years. He testified that Yarbrough had been an agent of the company out

on the street selling policies. Yarbrough had sold many policies and obtained many applications before March 1, 1973. He also testified that the company had a medical authorization from plaintiff authorizing any hospital, physician or other person who had attended applicant to furnish United any and all medical information. A letter written by Collier to the company was introduced into evidence. In the letter he said that he interviewed plaintiff on March 20, 1973, and she stated her husband was unemployed. Collier was not examined as to this statement at trial, nor did he swear to the accuracy of the statements. Obviously, the statements made in the letter were not made under oath. At trial, the only statement in the letter which was discussed was plaintiff's statement that she signed the application because applicant's hand was hurt.

In 1973 Andrew Davis was an assistant manager of United; his duties were to train and supervise agents. He testified that Yarbrough was a very good agent. Yarbrough's responsibilities entailed servicing present policy owners and procuring new ones.

In taking applications for life insurance, the agent was to outline the best possible type of insurance for the applicants as well as the coverage the company was going to offer to them for a premium, and to explain the contents of the policy, the good points and the bad points. The agent could explain the company's position and the legal rights of a conditional receipt. As a rule, the agent had no authority to waive any of the contents of an insurance policy or the requirements of the application. He also did not have authority to waive the medical examination if that was required. Davis saw every application which came through but did not see this one. He agreed that was unusual.

According to Davis, in taking applications, the elements to be considered by the agent as to insurability were first the needs of the client; second, his ability to pay; and third, his physical or moral background. In Davis' judgment if the application said "laid off at the present time for pro football training" it would have a definite effect on getting this amount of insurance issued by the company. He did not specify the kind of effect it would have, however. He admitted on cross-examination that the mere fact somebody was unemployed did not necessarily mean they would not qualify for insurance. He also agreed that basically a person who was 25 years old, an athlete, had participated in sports and had three years of college education would have the physical and moral background to qualify; however, the agent would still have to show on the application his means of support and livelihood. Davis also admitted, in response to the court's question, that an unemployed wife of a working husband could obtain insurance.

Davis stated that the conditional binder did not provide instant coverage. It was interim coverage in the event that this company did not

accept the application. He explained: "We let them know they are covered in the event of accidental death in the time between that [*sic*] the application is accepted, and the time that the company issues a policy, if the application is accepted by the company." The purpose of the conditions at the bottom of the application was to explain what the conditional receipt was and what it did. He went on to say that with the initial payment of the premium the applicant had interim insurance until such time as the insurance company investigated the insurability of the applicant, or until such time as the policy is actually issued. The following then ensued:

"Q. Now, you mentioned interim insurance. Can that be interim insurance for a policy that exceeds the non-medical limits until such time as the medical is provided?

A. Well, with interim insurance—and once again, I as a manager, or assistant manager or agent, cannot tell what policy or what application will be accepted for certain by the insurance company—but in my presentation, I would give some assurance to the prospect or client that their policy—at least, the application would be accepted by the company. So the interim insurance clause and the conditional receipt set forth the point that they will be insured up until the point that the company actually—including the point when the company actually physically issued the insurance policy, providing that all the statements and the insurability is accepted by the company.

Q. In other words, there is no insurance until such time as all of these things have been established; then it reverts back to the date of the application, is that right?

A. No, not necessarily. Interim insurance is something that—like I say, these statements on the application themselves—and this is what we have the agents and management trained to present. If a person has all of the questions answered and all of the statements meet the company criteria—this is for health and moral purposes as far as work. But like I say, a person would still be technically insured for accidental death, because that wouldn't have anything to do with the current statements on the application itself."

On cross-examination, Davis attempted to retract these statements by stating:

"There are different conditionaling insurability clauses in that particular application. We do have conditional receipts that actually state on the conditional receipts themselves that the applicant does have interim insurance. But on that particular application, it did not state that. So that was something that I was voicing as to what I

know about conditional receipts. But it did not apply to that particular application."[1]

Davis admitted that claims had been paid by United to persons who had died before a policy had actually been issued and that under the application and receipt involved here the company could not, merely because of the death, say there is no coverage.

Iler Brady has been an underwriter for United for 12 years. She checked the application when it was received. From the amount of insurance involved she knew a medical and inspection report was required. A medical examination was required because the applicant had sought over $15,000 in insurance. She did not order these, however, because he was already deceased. She stated that they could not establish insurability without the medical examination and they would not have issued a policy for $20,000 to a man who was unemployed. While they issued policies to housewives, the policy limit available was $5,000.

On cross-examination, she stated that they issued policies according to the application date, and that if a person was unemployed on the date of application although reporting for a job the next week, a policy would not be issued. He would not have been issued a policy even if he were a millionaire. But later she stated that "if the medical was clear, we would have issued the policy." She also admitted that there was nothing requiring employment in the document introduced into evidence and used as one of the bases by the underwriting department. She also admitted that there was nothing on the application that would disqualify the applicant immediately from coverage.

Brady testified that they checked into applicant's background because an inspection report was automatic. What they discovered was that he was deceased. They did not check any further. They never checked his credit or work record. Likewise, they did not send for a medical report because he was deceased. They did not write to the football team to determine whether they had any medical records on applicant.

When she wrote up the underwriter's data sheet, which she did before she knew he was deceased, she did not put him down as unemployed. She put his occupation down as football player. She rated the occupation as extra hazardous, requiring an extra premium. However, when confronted with the rate book she admitted the company rated football players as a standard risk both for life insurance and disability insurance.

---

[1] Thus exhibiting complete confusion between applications and conditional receipts since the conditions as to conditional receipts only apply to receipts not to applications; likewise restrictions in any application in conflict with the receipt, as for example, a provision that the policy must be issued during the lifetime of the applicant, are inapplicable if a conditional receipt is issued. 13A Appleman Insurance Law & Practice §7532 (1981).

United, relying on *Gerrib v. Northwestern Mutual Life Insurance Co.* (1930), 256 Ill. App. 506; *Wallace v. Prudential Insurance Co.* (1973), 12 Ill. App. 3d 623, 299 N.E.2d 344; *Reynolds v. Guarantee Reserve Life Insurance Co.* (1976), 44 Ill. App. 3d 764, 358 N.E.2d 940, *appeal denied* (1977), 65 Ill. 2d 584, contends that there was no insurance coverage because it never accepted or approved the application. In *Gerrib*, the application had been rejected and the premium returned two days before the plaintiff's death; thus, no coverage could be found under the binder. (*Underwood v. Greenwich Ins. Co.* (1900), 161 N.Y. 413, 55 N.E. 936; *Cotton States Life Insurance Co. v. Scurry* (1873), 50 Ga. 48.) In *Wallace* the plaintiff was unable to produce the conditional receipt and the appellate court relied on the provisions of the application, not the receipt, in denying coverage. Likewise in *Reynolds* there also was no conditional binding receipt. Indeed, in that case the court pointed out at 44 Ill. App. 3d 764, 768-69, 358 N.E.2d 943, 944:

> "The cases cited by plaintiffs all involved language in their applications or receipts, or both, which were of a nature usually referred to as creating 'conditional receipts' or 'conditional binders.' That type of language follows this general pattern: If payment is made with the application, coverage starts on the date of the application or from the time of a medical examination or some other similar date, provided the company approves the application or is satisfied that the applicant met the company's medical requirements upon such date; if payment is not made with the application, no insurance is in effect until a later date, usually issuance or delivery of the policy. The courts' reasoning in these cases proceeds along these lines. The general impression given to the layman from these provisions is that he is covered from the earlier date if he pays at the time of application and not covered until the later date if he does not pay at that time. The applicant is entitled to rely on this reasonable impression and need not seek any other protection. If he is injured or killed after he has met the objective requirements of the insurer, the insurer is estopped from arbitrarily rejecting the application so as to deny coverage on the 'technical' requirement of a condition precedent of acceptance, approval or satisfaction."

Thus it was stated in *Gaunt v. John Hancock Mutual Life Insurance Co.* (2d Cir. 1947), 160 F.2d 599, 601-02, *cert. denied* (1947), 331 U.S. 849, 91 L. Ed. 1858, 67 S. Ct. 1736:

> "[T]he application was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts; and not one in a hundred would

suppose that he would be covered, not 'as of the date of completion of Part B,' as the defendant promised, but only as of the date of approval. Had that been what the defendant meant, certainly it was easy to say so; and had it in addition meant to make the policy retroactive for some purposes, certainly it was easy to say that too. * * * [F]or the ordinary applicant who has paid his first premium and has successfully passed his physical examination, would not by the remotest chance understand the clause as leaving him uncovered until the insurer at its leisure approved the risk; he would assume that he was getting immediate coverage for his money."

Likewise the court in *Simses v. North American Co. for Life & Health Insurance* (1978), 175 Conn. 77, 88, 394 A.2d 710, 715, again looking at the reasonable expectations of the applicant, held that a reasonable reading of the receipt as a whole suggested that the policy is in force until the company notifies the applicant that it has terminated coverage saying:

"Because the application so clearly conveys that the policy would not take effect until issued *unless* the first premium was paid, an applicant's likely response would be to assume that if the first premium were paid, coverage would come into immediate effect. The words of the receipt do not clearly counter this assumption. The applicant could well assume that if he, having paid the first full premium, not having requested a later date, having submitted all the requested data, and having honestly answered the detailed questions on the application, a temporary policy would take effect, even in the absence of a physical examination, until future notice or issuance of the formal policy."

Similarly the court in *Prudential Insurance Co. of America v. Lamme* (1967), 83 Nev. 146, 148-49, 425 P.2d 346, 347-48, in finding coverage despite the fact that the physical examination required by the application had not been made, pointed out:

"The position of Prudential has appeal as a matter of strict contract law. Yet, an insurance policy is not an ordinary contract. It is a complex instrument, unilaterally prepared, and seldom understood by the assured. The same is equally true of the conditional receipt. The parties are not similarly situated. The company and its representatives are expert in the field; the applicant is not. A court should not be unaware of this reality and subordinate its significance to strict legal doctrine. Allen v. Metropolitan Life Ins. Co., [44 N.J. 294,] 208 A.2d 638 (1965). Nor should a court be obliged to overlook the obvious advantage to the company in obtaining payment of the premium when the application is made. It is a

device to avoid the possibility that the applicant will change his mind and revoke his application, or deal with a rival company. Metropolitan Life Ins. Co., v. Grant, 268 F.2d 307 (9 Cir. 1959), Pope, J. concurring. A conditional receipt tends to encourage deception. We do not mean to imply affirmative misconduct by the soliciting insurance agent. We suggest only that if nothing is said about the complicated and legalistic phrasing of the receipt, and the agent accepts an application for insurance together with the first premium payment, the applicant has reason to believe that he is insured. Otherwise, he is deceived."

Again it was stated in *Service v. Pyramid Life Insurance Co.* (1968), 201 Kan. 196, 214, 440 P.2d 944, 959:

"Many cases in the courts indicate a trend to construe the conditions liberally, and to treat receipts similar in wording to the one before us as binding during the interim regardless of the ultimate action of the insurance carrier on the application. These decisions are based upon the assurance that if the receipt meant anything, no other result could have been intended by the parties, for unless the insured was to be protected against death during the interim period there would be no advantage to him in paying his premium in advance. If the company did not intend that there should be insurance effective pending the date of the application, or medical, as in this case, and the date of approval of the risk and the issuance of the policy, then the company would be charging and obtaining the full amount of the premium for one year, while the period of actual insurance would be as many days less than one year as there were days intervening between the date of the application and the approval. In other words, the insured would be paying for something which he did not receive."

An examination of these and other cases (see 12A Appleman Insurance Law & Practice §§7237—7243 (1981)) reveals that the recent cases have split in their treatment of such conditional binders, some treating the insurer's approval as a condition precedent or more accurately the insurer's rejection as a negative condition precedent. Under the cases the applicant is covered if he is insurable on the date of the application or the medical examination (where such is referred to in the binder and required by the insurer). Other courts treat the insurer's rejection as a condition subsequent. Under these cases the applicant has coverage until the application is rejected or notice of the rejection is given to the insured. This rule would seem to more completely realize the expectations of the parties.

Obviously, if we were to follow the latter rule the applicant's death here would be covered since the application was not rejected until after

his death. But even if we were to adopt the condition precedent approach that coverage is dependent upon the insurability of the applicant (see, for example, *Rivota v. Fidelity & Guaranty Life Insurance Co.* (7th Cir. 1974), 497 F.2d 1225), we would still agree with the trial court that insurance existed since the defendant has failed to establish that the applicant was uninsurable at the time of the application. The insurer has given only two reasons for the rejection of the application: (1) the applicant was unemployed at the time of the application and (2) there was no medical examination.

■■■ The trial court, which was the trier of fact, found that the applicant was regularly employed at the time of his death. We are bound by its findings unless there is no evidence to support them. (*In re Estate of Freund* (1978), 63 Ill. App. 3d 1, 379 N.E.2d 935; *Schaefer v. Checker Taxi Co.* (1976), 41 Ill. App. 3d 32, 353 N.E.2d 338; Ill. L. & Prac. *Appeal & Error* §786 (1953).) A perusal of the record discloses that there was no competent evidence in the record to refute plaintiff's testimony that her husband was employed at the time of his death, being under contract with the Broncos. The statement in Collier's letter and the statement by Yarbrough that applicant was unemployed were not competent evidence and were properly disregarded by the trial court. Collier's letter was blatant hearsay and does not qualify as an exception under the business records rule. (Ill. Rev. Stat. 1979, ch. 110A, par. 236.) Yarbrough's statement was a mere opinion without any facts in the record to support his conclusion. In any event, it was for the trial court to determine the credibility of the witnesses. *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 226 N.E.2d 624; *Wyman-Gordon Co. v. Lynch Area Fire Protection District* (1977), 51 Ill. App. 3d 451, 366 N.E.2d 1055; *Rankin v. Hojka* (1976), 42 Ill. App. 3d 440, 355 N.E.2d 768; *Geist v. Lehmann* (1974), 19 Ill. App. 3d 557, 312 N.E.2d 42.

United also contends that the insurance coverage is not effective since the applicant never underwent a medical examination. However, unlike most binders, there was absolutely no reference in either the application or the receipt to the need for a medical examination, and the applicant had not otherwise been informed prior to his death that an examination was required. It is generally recognized that absent such notice, the failure to undergo a medical examination is no defense. (*Anderson v. Metropolitan Life Insurance Co.* (1972), 69 Misc. 2d 205, 329 N.Y.S.2d 197, *aff'd* (1973), 75 Misc. 2d 1003, 349 N.Y.S. 2d 925; *Denney v. Washington National Insurance Co.* (1968), 14 Mich. App. 469, 165 N.W.2d 600; *Monumental Life Insurance Co. v. Hakey* (1976), 171 Ind. App. 56, 354 N.E.2d 333; *Life & Casualty Insurance Co. v. Vertrees* (1958), 44 Tenn. App. 672, 318 S.W.2d 559.) Any other result would defeat the whole purpose of conditional receipts, which is to guarantee the

applicant at least temporary coverage limited only by expressly communicated conditions, and would allow the insurer to leave the applicant "uncovered until the insurer at its leisure approved the risk" (*Gaunt*, 160 F.2d 599, 602), by the simple expedient of failing to communicate the necessity of a medical examination to the applicant. The insurer can always protect itself by clearly communicating any limitations on coverage to the applicant before the premium is paid or by taking a "C.O.D." application. (*Collister v. Nationwide Life Insurance Co.* (1978), 479 Pa. 579, 388 A.2d 1346, *cert. denied* (1979), 439 U.S. 1089, 59 L. Ed. 2d 55, 99 S. Ct. 871; *Prudential Insurance Co. of America v. Lamme* (1967), 83 Nev. 146, 425 P.2d 346; 12A Appleman Insurance Law & Practice §7237 (1981).) Thus we find that whether under this conditional binder we hold that the insured's rejection was a negative condition precedent or that it was a condition subsequent the applicant's death would be covered.

However, it is not necessary for this court to determine which rule we would adopt in the appropriate case because we rely on an independent basis for finding coverage; the insurer in this case is bound by its agent's representations as to immediate coverage. It is undisputed that the insurer's agent Yarbrough told the applicant and his wife that he was immediately covered for accidental death. It is also undisputed that applicant's death was due solely to accident. We are aware that in many cases, particularly older cases, such as *Sommerio v. Prudential Insurance Co.* (1937), 289 Ill. App. 520, 7 N.E.2d 631, courts have refused to hold a life insurer responsible for the representations of its agent. However, as stated in 12A Appleman Insurance Law & Practice §7242, at 241 (1981):

> "To make this matter clear, a life insurance agent ordinarily must be considered to be a soliciting agent having no power to bind the company by his acts, in the sense of actual authority. When he makes a statement concerning a binder which he is authorized to deliver, it is not he, the individual, who binds the company; it is the company which binds itself, speaking through his lips. Since it, as an entity, can act only through representatives, it elects to speak through him; and, when it arms him with binders, which he has ostensible authority to construe, his words are those of the insurer irrespective of the terminology or cautions it may place in such instruments."

In the present case, it is clear that Yarbrough had not only apparent authority but also actual authority to explain to the applicant his rights under the binder. Andrew Davis, his superior, testified that the agent had the authority to explain his legal rights under a conditional receipt and there was nothing in the application or binder limiting this authority. Accordingly, the insurer was bound by this explanation even if the explanation was wrong.

Indeed, any other result would be absurd in light of the hopeless

ambiguities in both the application and conditional binding receipt, especially when read together. The application provides that except as may be provided in the receipt, the company shall incur no liability until a policy has been issued, delivered and paid for. Thus the application, as the court in *Simses* pointed out, indicates that the conditional receipt provides for some kind of coverage. Yet all the receipt says is that if an application is approved, the policy shall be in force from the date of application. Coverage can exist without and before the existence of a policy so the provision fails to explain when coverage becomes effective. All the clause says is that the policy once issued will bear a previous date. If we assume that there is no coverage until issuance as United contends, then we must also assume that it is to the insured's disadvantage to pay the premium. If he does not, he does not have the coverage until the policy is issued and paid for; if he does, he still has no coverage until the policy is issued, but the insurer is able to backdate the policy and receive one or two months' premiums for which it bore no risk. Yet no applicant would reasonably expect that he is paying something for nothing. (The insurer on appeal has contended that the applicant did receive something in that he was guaranteed coverage if he was found to be insurable at the time of the application. There is, however, nothing in the binder so providing. Furthermore, insurer's conduct is inconsistent with this interpretation since it stopped its investigation when it discovered he had died instead of attempting to determine the applicant's health on the morning of March 1 and his medical history by means other than a medical examination.) In addition, the application stated it had to be accepted by the home office, but the receipt did not say by whom it had to be approved.

In light of this confusion, it was only reasonable for the applicant to seek an explanation from the agent and to rely on the explanation received. The insurer could have taken a "C.O.D." application; it did not. It also could have issued a binder which clearly, conspicuously and in simple language fully explained all of the conditions and limitations. It did not. If it had, applicant would probably have refused to pay the advance premium, but that is immaterial. It also could and should have properly trained and monitored its agents as to an accurate explanation of the coverage provided by the binder if the explanation given by Yarbrough was in fact inaccurate. To the contrary, however, Yarbrough, according to his testimony, was trained to tell applicants they had immediate coverage. When it fails to do any of these, it has no grounds for complaint when the courts enforce the reasonable expectations of the insured, expectations created by its own, authorized agent.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

JIGANTI and LINN, JJ., concur.